UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------

BRIAN MORLEY,

                       Plaintiff,

          v.

JOHN OLIVER and PARTIALLY IMPORTANT
PRODUCTIONS, LLC,

                    Defendants.

-------------------------------------------------------------------

Case No.  25-cv-2563

**COMPLAINT**

JURY TRIAL DEMANDED

       Plaintiff Dr. Brian Morley ("Dr. Morley"), by and through his undersigned counsel, for his Complaint against defendants John Oliver and Partially Important Productions, LLC (collectively, "Defendants"), respectfully alleges as follows:

### INTRODUCTION

       1.      Defendants falsely told millions of viewers of their show, *Last Week Tonight With John Oliver*, that Dr. Morley testified in a Medicaid hearing that "he thinks it's okay if people have shit on them for days," intentionally leading viewers to believe that Dr. Morley made these alleged statements about—and illegally denied Medicaid services to—a young man who has severe mental impairment, was harnessed in a wheelchair, wears diapers, and required in-home bathing and diaper changing because he could do neither himself. Defendants' false accusations were designed to spark outrage, and they did. The false accusations Defendants made were so heinous that John Oliver felt justified in telling his millions of viewers: "fuck that doctor with a rusty canoe. I hope he gets tetanus of the balls." Oliver's feigned outrage at Dr. Morley was fabricated for ratings and profits at the expense of Dr. Morley's reputation and personal well-being.

1

2.    Defendants expressly asserted that they were not taking Dr. Morley's testimony out of context, knowing they had intentionally manipulated the context and their broadcast to convey a defamatory meaning that they knew was untrue. According to both the broadcast itself and records provided by Defendants' counsel, Defendants possessed and reviewed "the full hearing" in which Dr. Morley testified; and thus, Defendants knew what his testimony was, knew the patient about whom he was testifying, knew that that patient was not the young man they depicted, and knew that Dr. Morley's testimony stood for the *opposite* of the defamatory meanings they ascribed to it.

3.    In doing so, Defendants made Dr. Morley out to be the face of an asserted "nearly 900% increase in [Medicaid] members being illegally denied services or care" by "prioritizing cost cutting over patients," when they also knew and failed to disclose that Dr. Morley *approved* care in the unrelated proceeding from which they snipped his testimony and that the administrative law judge and Department of Human Services presiding over that proceeding affirmed his opinion on medical necessity with respect to the partial denial of services.

4.    Moreover, the very "audit" report on which Defendants based the assertion of an "891% increase in members being illegally denied services or care" defined Dr. Morley's opinion on medical necessity as inherently "legal." It specifically referred to "appeals where the judge agreed with the reduction and/or denial of services [as] ruling it legal" and also stated "[s]eeing a denial affirmed is always a good result, because it means a legally correct decision was made" while "seeing a denial overturned is always a bad result, because it means a legally incorrect decision was made". In the proceeding subject of Dr. Morley's testimony, both the approval and denial of services were affirmed on appeal and the partial denial was—by the letter of the audit report on which Defendants relied—a legal rather than illegal denial of services or care.

5.     There is no doubt as to the defamatory meanings Defendants conveyed, which were made possible only by the extent to which Defendants consciously manipulated the context of their broadcast, Dr. Morley's testimony, and the outcome of the administrative proceeding itself. Their viewers have spoken. Defendants' viewers have made, as examples, the following comments on Defendants' YouTube page, where the episode at issue has garnered approximately 3.5 million views, as follows:

**@niemo118** 8 months ago
It's maddening that the doctor tried to equate wiping poorly to sitting in a diaper full of days old human waste.

**@gavo7911** 8 months ago (edited)
As a licensed PSS, when I heard that doctor say it's okay for people to be "dirty" for a few days, I legit felt sick to my stomach. Incontinence for disabled people can be genuinely life-threatening, both physically and mentally. Horrific thing to say for a doctor.

Also as someone who had been a full-time caregiver, you CAN NOT leave a person in a diaper for more than an hour at MOST without skin breakdown. Days would land you in the ER with infection 😣

**@splendidcolors** 8 months ago (edited)
**@niemo118** If I "wipe poorly" it burns within a couple of hours.

If I were letting a baby lie in a full diaper for a day, CPS would take them away from me.

**@VictoriousGardenosaurus** 8 months ago
Any parent who let a diaper go too long has seen rashes and irritation.

I can't imagine any scenario in which a person with a dozen years of education doesn't know that.

**@sachikoaichan** 8 months ago
That part almost had me screaming at my screen, because having a person sit in their own waste is a great way to get bedsores and UTIs.

 **@MisterNightfish** 8 months ago
That "doctor" going "Yup, sometimes we let people sit in their own shit for a few days, ain't no big deal" was really something. How is he a real person?

👍 818  👎  Reply

6.      Dr. Morley did not equate wiping poorly with leaving anyone sitting in their own feces for days—whether disabled, incontinent, wearing diapers or not. He testified to the opposite. He testified that people who, for instance, are immobile, laying in their own bowel movements, cannot toilet transfer, or cannot bathe themselves—in other words, people like the individual Defendants depicted—require significant in-home care, including "to have someone wiping them and getting the feces off" to ensure "medical safety."

7.      It was Defendants who knowingly and falsely conveyed that Dr. Morley testified that "it is okay" to leave someone who is incontinent, wears diapers, or otherwise sits in their own bowel movements in their "shit for days."

8.      And they could only accomplish that defamation by (a) use of an ellipsis in the sole quote of Dr. Morley that they utilized, (b) ignoring both the sentence of Dr. Morley's testimony immediately preceding the quote and otherwise ignoring the totality of his testimony, (c) expressly tying his testimony to the "illegal" denial of Medicaid services by use of an audit report that itself defined Dr. Morley's decision to be "legal," and (d) expressly tying his testimony to video of an individual who was in all material respects dissimilar to the altogether different individual about whom Dr. Morley was testifying.

9.      For these reasons and those that follow, Dr. Morley brings this is action for defamation against Defendants for their knowing and malicious false accusations against Morley.

## PARTIES, JURISDICTION, AND VENUE

10.     Plaintiff Dr. Morley is a resident and citizen of the state of Pennsylvania.

11.     Dr. Morley is a board certified physician, having served in the United States Army as a field surgeon and practiced family medicine prior to taking on the role of medical director for

a Managed Care Organization ("MCO") operating in Iowa. He is now and was at the time of Defendants' accusations an administrator for a hospital serving as a Physician Advisor where, like his role as medical director, he reviews patient needs to determine the appropriate level of care.

12.     On information and belief, Defendants research, write, edit, produce, and air the television broadcast *Last Week Tonight With John Oliver* ("*Last Week Tonight*"), filmed and broadcast from New York and this District specifically.

13.     *Last Week Tonight* is broadcast via Max, a digital platform of Home Box Office, Inc., and is otherwise published on various international platforms and via *Last Week Tonight's* YouTube page.

14.     Known for hard hitting journalism while also garnering laughs, *Last Week Tonight* has received more than 60 Emmy Nominations with 30 wins. The weekly broadcast reportedly reaches more than 4 million viewers per episode, and the episode at issue here has approximately 3.5 million views on the show's YouTube page alone. Defendants proclaim that their broadcast is "meticulously researched."

15.     Defendant John Oliver is a writer, the host, and executive producer of *Last Week Tonight.* Upon information and belief, Defendant Oliver is a resident and citizen of New York.

16.     According to correspondence from Defendants' counsel, Defendant Partially Important Productions, LLC ("Partially Important") produces *Last Week Tonight*.

17.     According to the United States Copyright Office, Defendant Partially Important claimed authorship of the entire episode at issue.

18.     Defendant Partially Important is a Delaware limited liability company registered to do business in New York.

19.    On information and belief, including a previously filed sworn statement by the CEO of Non-Party Avalon Television, Inc. in an unrelated matter, Defendant Partially Important's sole member is Avalon Television, Inc.

20.    Avalon Television, Inc. is a California corporation with its principal place of business in Beverly Hills, California and, upon information and belief, Avalon Television, Inc. additionally maintains offices at 104 West 27th Street, 5th Floor, New York, New York 10001.

21.    For purposes of diversity jurisdiction, Defendant Partially Important is a citizen of California.

22.    This Court has personal jurisdiction over all Defendants.

23.    Defendant Partially Important has expressly availed itself of conducting business in New York.

24.    Defendants published the defamation at issue from and in New York.

25.    Each Defendant has significant general contacts with New York and this District.

26.    Each Defendant's contacts with New York and this District specifically gave rise to the cause of action alleged herein.

27.    Defendants each transact substantial business within New York, pursuant to contracts to produce and publish *Last Week Tonight*, and that business resulted in the defamation alleged herein.

28.    *Last Week Tonight* is filmed and published at the CBS Broadcast Center in New York, New York.

29.    Defendants each have sufficient contacts with New York to reasonably foresee defending a suit here and the exercise of jurisdiction over each Defendant comports with traditional notions of fair play and substantial justice.

30.     A substantial part of the events giving rise to Dr. Morley's claims occurred in this District, including the writing, production, filming, and publication of the defamatory episode at issue.

31.     There exists complete diversity of citizenship between Plaintiff Morley and Defendants.

32.     The amount in controversy exceeds $75,000, exclusive of interest, costs, and attorneys' fees.

33.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(1).

34.     Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(b)(2)-(3), 1391(c)(1)-(2), and 1391(d).

**FACTUAL BACKGROUND**

**Dr. Morley's Work for an MCO**

35.     In 2017, Dr. Morley was working as a medical director for a Managed Care Organization (MCO) named AmeriHealth Caritas.

36.     AmeriHealth Caritas was contracted by the state of Iowa to manage its Medicaid program.

37.     As a medical director for AmeriHealth Caritas, Dr. Morley was responsible for engaging in a second level review of requests for services by Medicaid recipients and/or their medical providers and making determinations as to the medical necessity and appropriate level of care pursuant to Medicaid's standards.

38.     As part of his role as medical director, Dr. Morley would occasionally testify in administrative proceedings. As shown below, Defendants entirely snipped out of context and

manipulated two sentences of Dr. Morley's testimony in one such proceeding (the "Administrative Hearing") in order to accomplish their defamation.

39.    Dr. Morley's testimony itself, unadorned by Defendants' manipulated context, was incapable of the meaning ascribed to it by Defendants.

40.    Dr. Morley's testimony only became defamatory through the false, defamatory, and manipulated context in which Defendants knowingly placed it.

### Defendants' Defamatory Accusations

41.    On April 14, 2024, Defendants published an episode of *Last Week Tonight* titled "Medicaid" (the "Episode").

42.    The Episode has since been republished via *Last Week Tonight's* YouTube page, garnering approximately 3.5 million views.

43.    The Episode may be viewed at Medicaid: Last Week Tonight with John Oliver (HBO) (https://www.youtube.com/watch?v=bVIsnOfNfCo) with the most pertinent excerpt being from minute marker 19:30-23:15.

44.    Throughout the Episode, Defendants generally attacked the efficacy of the Medicaid system, including addressing alleged fraud and abuse against Medicaid, Medicaid's alleged failure to properly police large-scale Medicaid fraud while over-policing services provided to and eligibility of individuals, Medicaid's alleged deficient procedures through which individuals unknowingly lose coverage, and Medicaid's alleged general propensity to make absurd errors.

45.    The Episode also addressed the alleged rise in the illegal denial of Medicaid services by MCOs for the purposes of corporate profit and at the expense of medically necessary patient care. It is that specific context in which Defendants defamed Dr. Morley.

46.    As the jumping off point for this discussion, Defendants expressly stated in the Episode that "there was a nearly 900% increase in members being illegally denied services or care and some of the cost cutting was absolutely enraging," and then utilized two purported examples: a young man named Louis along with video of Louis and Dr. Morley's testimony.

47.    By doing so and as further detailed below, Defendants conveyed their desired defamatory meanings about Dr. Morley through both discrete statements and the juxtaposition of several statements and visual cues.

48.    The Episode contains the following statements of and concerning Dr. Morley:

a.    Look, financial damage is one thing. But the most infuriating thing about MCOs is that, as with so many players in our for-profit healthcare system, *they are incentivized to cut costs at the expense of necessary care*. Because MCOs get paid a set monthly amount per person, meaning they get a fixed rate, so their profit is whatever they don't spend on patients. *And you can probably see where this is going.*

b.    In state after state, there've been heartbreaking stories of MCO's denying care and *prioritizing cost cutting over patients*.

c.    And just *to focus on Iowa*, it transitioned to using MCOs to run its Medicaid program in 2016, and in just its first three years, there was a nearly **900% increase in members being illegally denied services or care and some of the cost cutting was absolutely enraging**. *Like what happened with Louis* [], who has cerebral palsy and was living with his mother. He needs a lot of care, which prior to the switch over, was provided by Medicaid. *But once an MCO got involved*, he lost a lot of what he'd been getting, starting with his medications.

d.    [While showing Louis harnessed in a wheelchair from different media coverage]: "It was a nightmare. It was literally a nightmare. What am I gonna do, I can't afford all that medication." [Louis's mother]. Also cut were his daily nurse visits, so for six weeks Louis went **without the in-home bathing and diaper changing he'd had for years. "He wasn't getting changed like he would normally get changed two or three times a day**." [Louis's mother].

e.    Look that's [Louis's situation] obviously maddening. *And it doesn't get any better* when you hear a doctor at AmeriHealth, the CMO that took over in Iowa, explaining in a hearing about a **similar patient**, just what the corporate thinking was about the necessity of keeping people clean.

f.    [While showing "Dr. Brian Morley", playing a snippet of his testimony, and showing a transcript]: "People have bowel movements every day where they don't completely clean themselves, and we don't fuss over [them] too much. People are allowed to be dirty … You know, I would allow him to be a little dirty for a couple of days."

g.    Screenshot of the script shown:



h.    Look, I'll be honest, when I first heard that, *I thought that had to be taken out of context*. There is no way a doctor, a licensed physician, would testify in a hearing that **he thinks it's okay if people have shit on them for days**. So, *we got the full hearing*, and I'm not gonna play it for you, I'm just gonna tell you: he said it, he meant it, and it made me want to punch a hole in the wall.

i.    [Again conveying that Dr. Morley was discussing either Louis or a ***similar*** patient]: And just watch what happens when Louis and his mom were told about what that doctor just said…. "I would spit in his face, to be honest. Yeah, right Louis, you like to be clean. I think it's horrible. I don't have words for that."

j.    And while, legally, I have to tell you, AmeriHealth eventually restored Louis's service, it is a disgrace it was even a fight to begin with.

(Emphasis added to provide context clues about how each statement relates to one another and to emphasize the most particularized statements giving rise to defamatory meanings). The above statements are hereinafter referred to as the "False and Defamatory Statements."

49.     The False and Defamatory Statements took place in a sequence of under three minutes and twenty seconds and were, and reasonably would be, understood to be taken together.

50.     The False and Defamatory statements, alone, do not place the defamatory accusations in their appropriate context. Instead, Defendants utilized the juxtaposition of these statements with various audio and video segments to convey their false and defamatory meanings, including, without limitation, video of Louis harnessed in a wheelchair and Defendant Oliver's tone of voice.

51.     The False and Defamatory Statements were intended to be understood in context, including that each of the statements related to each other statement within the context of the Episode.

52.     Through the False and Defamatory Statements and the combination with those statements of various video and audio segments, individually in context and collectively as a whole, Defendants conveyed the false and defamatory meanings that (1) Dr. Morley illegally denied care to Louis and/or the alleged "similar" individual subject of his testimony (the "Actual Patient") and (2) Dr. Morley testified that it is "okay" for individuals who wear diapers and/or cannot bathe themselves "to have shit on them for days" and to otherwise be left sitting in their own bowel movements for days (hereinafter referred to as the "False and Defamatory Meanings").

53.     Defendants intended to, and did, convey the False and Defamatory Meanings.

**Defendants' Accusations are False and were Made Negligently and with Actual Malice**

54.     The False and Defamatory Meanings are each false.

55.     As expressly stated by Defendant Oliver in the Episode, Defendants "got the full hearing," *i.e.*, the Administrative Hearing, prior to publishing the Episode.

56.     In the Episode, Defendant Oliver otherwise conveyed that he reviewed the Administrative Hearing, stating "I'll be honest, when I first heard that, I thought that had to be taken out of context…. So, we got the full hearing, and I'm not gonna play it for you, I'm just gonna tell you: he said it, he meant it, and it made me want to punch a hole in the wall."

57.     According to correspondence from Defendants' counsel, Defendant Partially Important is "the producer of *Last Week Tonight*," and "the producers of *Last Week Tonight*" "obtained and reviewed an unabridged audio recording of the entire administrative hearing itself."[1]

58.     A particular Senior News Producer for *Last Week Tonight* contacted Dr. Morley shortly prior to airing the Episode.

59.     Dr. Morley queried whether the Senior News Producer had reviewed the Administrative Hearing, and the Producer responded in the affirmative.

60.     Thus, Defendant Partially Important has admitted that an individual producer or agent of Defendant Partially Important responsible for providing information about Dr. Morley for publication obtained and reviewed the entire Administrative Hearing and therefore had the knowledge and information alleged below, which reveals negligence, knowledge of falsity, and/or a reckless disregard for the truth on behalf of the organization.

61.     The Administrative Hearing spanned approximately three hours, and Dr. Morley's testimony spanned approximately one hour and fifteen minutes.

---

[1] All statements made herein concerning the Actual Patient are based upon the public records provided to Dr. Morley's counsel by Defendants (rather than any information independently known to Dr. Morley and/or which was not contained in the records provided by Defendants) or the already-anonymized court orders received by counsel in response to public records requests, and all reasonable efforts have otherwise been made to anonymize the Actual Patient.

62.    Based upon the Administrative Hearing, Defendants knew that the medical provider for the Actual Patient submitted a request to AmeriHealth Caritas to pre-approve 120 in-home health aide visits during a 60-day period.

63.    Based upon the Administrative Hearing, Defendants knew and disregarded that Dr. Morley *approved* 50 home visits during the 60-day period but opined that the additional 70 visits were not medically necessary and therefore not an appropriate taxpayer expense.

64.    Based upon the Administrative Hearing, Defendants knew and disregarded that Dr. Morley approved nearly 6 home visits per week when the MCO's objective medical criteria called InterQual utilized for identifying the appropriate level of care recommended 5 home visits every two weeks. I.e., Dr. Morley approximately doubled the recommendation.

65.    Based upon the Administrative Hearing, Defendants knew that the Actual Patient did not testify in any fashion or personally appear during the hearing, that the Actual Patient's physician did not appear for the hearing, and that the Actual Patient's regular home health aides did not testify during the hearing.

66.    Based upon the Administrative Hearing, Defendants knew and disregarded that the hearing did not concern Louis or his treatment, plan of care, or the approval or denial of Medicaid services to Louis.

67.    Defendants otherwise had no basis with which to connect Dr. Morley and Louis.

68.    Defendants knew, contradicted, and otherwise failed to disclose that neither Dr. Morley's testimony nor the Administrative Hearing was about Louis.

69.    Based upon the Administrative Hearing, Defendants knew and disregarded that Louis was in no sense material to their False and Defamatory Statements "similar" to the Actual Patient.

70.    Defendants knew, contradicted, and otherwise failed to disclose that Louis was not "similar" to the Actual Patient in any material sense.

71.    Defendants portrayed Louis as a young man who had severe mental impairment, who was harnessed in a wheelchair, who wore diapers, and who required in-home bathing and diaper changing because he could do neither himself.

72.    Based upon the Administrative Hearing, and the administrative court's orders in the Administrative Hearing, Defendants knew, contradicted, and otherwise failed to disclose that that the Actual Patient was not confined to a wheelchair, was not incontinent, did not wear diapers, independently toilet transferred, was independently mobile, could change his or her own clothes, bathed him or herself, and did not require in-home diaper changing or assistance to bathe generally.

73.    Based upon the Administrative Hearing, Defendants knew, contradicted, and otherwise failed to disclose that, nonetheless, Dr. Morley approved nearly 6 in-home visits per week to the Actual Patient.

74.    Based upon the Administrative Hearing, Defendants knew, contradicted, and otherwise failed to disclose that the Actual Patient worked outside of the home.

75.    Based upon the Administrative Hearing, Defendants knew, contradicted, and otherwise failed to disclose that Dr. Morley did not testify, at all, that it is "okay" or medically appropriate for individuals wearing diapers or who are otherwise immobile "to have shit on them for days."

76.    Based upon the Administrative Hearing, Defendants knew, contradicted, and otherwise failed to disclose that Dr. Morley did not testify that it is "okay" or medically appropriate for *anyone* to sit or lay in their own feces, for days at a time or otherwise.

77.     Based upon the Administrative Hearing, Defendants knew, contradicted, and otherwise failed to disclose that Dr. Morley testified that for patients who are immobile, who need transfer assistance, who are laying in their own feces or urine, who cannot bathe themselves, or who have significant concomitant comorbidities, "you would want to have someone wiping them and getting the feces off," but that was not at issue in the "specific case" of the Actual Patient.

78.     Based upon the Administrative Hearing, Defendants knew, contradicted, and otherwise failed to disclose that the sole quote attributed to Dr. Morley was about a hypothetical average person, who is independently mobile and can toilet transfer but who may not succeed in completely removing all feces following a bowel movement.

79.     In fact, in the very answer Defendants attributed to Dr. Morley, Defendants omitted the following emphasized language, which itself referred back to immediately preceding testimony on the subject:

> **In certain cases, yes, with the patient with significant comorbidities, you would want to have someone wiping them and getting the feces off**. But *like I said*, people have bowel movements every day where they don't completely clean themselves and we don't fuss over too much. People are allowed to be dirty. **It's when the dirty and the feces and the urine interfere with, you know, medical safety, like in someone who has concomitant comorbidities that you worry, but not in this specific case.** I would allow him to be a little dirty for a couple days.

80.     Based upon the Administrative Hearing, Defendants knew, contradicted, and otherwise failed to disclose that in the above quote Dr. Morley was referring back to the testimony he had given in response to the question immediately preceding this snippet—i.e. "like I said"— wherein he explained that "a little dirty" was in reference to the average individual who is independently mobile but may not wipe perfectly—not someone who is wearing diapers or otherwise laying in their own bowel movements:

> There are likely people running, you know, walking around in society today that have, you know, bowel movements that aren't clean and they have feces on their

skin for whatever reason, but they're, you know, for the most part, they're mobile and they're not laying in it like someone who might be elderly, who's immobile with concomitant medical problems like diabetes.

81.     Based upon the Administrative Hearing, Defendants knew, contradicted, and otherwise failed to disclose that in the sole quote attributed to him Dr. Morley was also referring to testimony in which he explained that a "hypothetical" someone who is incontinent or immobile (i.e., wearing diapers) *would* develop skin breakdown if feces were not promptly removed from their skin but that would not be the case for the "hypothetical" person who is not incontinent and is mobile:

> If feces were left on the skin for an extended period of time in someone that's totally immobile, you can get significant skin breakdown. But if feces are left on the skin for several hours, or even a day, and the feces are removed the next day in someone that's mobile and is not confined to a bed, then it would just be a matter of washing the feces off.

82.     Had Defendants been honest about Dr. Morley's testimony, the entire meaning and gist of their segment on Dr. Morley would have changed—Dr. Morley was merely explaining that it is medically necessary for people like Louis to have someone there to clean them and to receive multiple in-home visits per day, while it is not medically necessary for people who do not wear diapers, can toilet transfer independently, and are mobile to have *two times a day* visits for this purpose.

83.     Defendants knew, contradicted, and failed to disclose that Dr. Morley did not illegally deny Medicaid services to Louis and/or the Actual Patient.

84.     Defendants knew, contradicted, and failed to disclose that the ALJ and the administrative agency, instead, each affirmed Dr. Morley's determination of the appropriate amount of Medicaid services to be provided to the Actual Patient.

85.     From the "audit" report Defendants' relied upon, Defendants knew, contradicted, and failed to disclose that the very "audit" report on which they relied for the assertion of an 891% increase in the illegal denial of services or care itself defined Dr. Morley's actions in the Administrative Hearing as legal rather than illegal, including because "[s]eeing a denial affirmed is always a good result, because it means a legally correct decision was made."

86.     Upon information and belief, Defendants scripted the Episode in advance, and the Episode did not air live.

87.     Upon information and belief, Defendants reviewed and approved the scripted Episode in advance.

88.     *Last Week Tonight* is not a live broadcast, and Defendants chose to film and edit the Episode and thereafter air the False and Defamatory Statements and Meanings, despite their knowledge of falsity and reckless disregard for the truth.

89.     In respect of the Senior News Producer who contacted Dr. Morley, Dr. Morley advised the Producer that he was willing to meet with the Producer and the Actual Patient to explain his testimony.

90.     The Producer refused to undertake this effort, stating that *Last Week Tonight* does not do that.

91.     To the extent Defendants failed to review the Administrative Hearing, or any material part of it, prior to airing the Episode, Defendants published with actual malice in that they purposefully avoided discovering the falsity of their False and Defamatory Statements and Meanings, while otherwise claiming that they had reviewed it.

92.     Based upon the Producer's response to Dr. Morley pre-publication, Dr. Morley additionally alleges that Defendants failed to check with another obvious source of information to

ascertain the truth or falsity of their False and Defamatory Statements and Meanings—the Actual Patient.

### Demand for Retraction

93.    In October 2024, Dr. Morley demanded that Defendants retract their False and Defamatory Statements.

94.    In November 2024, Defendants refused to retract their False and Defamatory Statements.

95.    The Episode remains available on HBO's Max platform and on *Last Week Tonight's* YouTube page.

### FIRST CAUSE OF ACTION:
### <u>DEFAMATION</u>

96.    Morley incorporates by reference paragraphs 1 through 95 of this Complaint as though set forth herein in their entirety.

97.    Defendants participated in the publication of the Episode, through writing, producing, editing, and/or airing the Episode.

98.    Defendants published to the world, including to members of the public in this District, via the Episode the False and Defamatory Statements and Meanings.

99.    Defendants published the False and Defamatory Statements and Meanings to third parties without privilege.

100.    In the context of the Episode, the False and Defamatory Statements conveyed, and Defendants intended to convey and were understood to convey, the False and Defamatory Meanings, to wit: that (1) Dr. Morley illegally denied care to Louis and/or the alleged "similar" Actual Patient and (2) Dr. Morley testified that it is "okay" for individuals who wear diapers and/or

cannot bathe themselves "to have shit on them for days" and to otherwise be left sitting in their own bowel movements for days.

101.    The False and Defamatory Statements and Meanings are false.

102.    The False and Defamatory Statements and Meanings are each of and concerning Dr. Morley, including because his name was expressly included in the 3-4 minute segment of the Episode at issue on multiple occasions.

103.    Defendants published the False and Defamatory Statements and Meanings negligently and with actual malice as set forth herein, including because:

    a.   they knew from the Administrative Hearing that Dr. Morley was not testifying about Louis;

    b.   they knew from the Administrative Hearing that Dr. Morley was not testifying about a "similar" patient in any material respect;

    c.   they knew from the Administrative Hearing that Dr. Morley expressly testified—including in the sole quote Defendants manipulated—that there are circumstances *not present in the Administrative Hearing* for which a patient would need someone present to wipe away feces to ensure medical safety;

    d.   they knew from the Administrative Hearing that the Actual Patient was not incontinent, did not wear diapers, independently toilet transfers, is independently mobile, and had a job;

    e.   they knew from the Administrative Proceeding that there was no illegal denial of services or care, because Dr. Morley's approval and partial denial of services was affirmed;

f.  they knew from their own "audit" report that the affirmance of Dr. Morley's approval and partial denial of services was explicitly defined as "legal" and "always a good result because it means a legally correct decision was made"; and

g.  Defendants nonetheless conveyed and published the False and Defamatory Meanings, including that Dr. Morley illegally denied Medicaid services to Louis and/or the Actual Patient and that Dr. Morley testified that patients in diapers who cannot change or bathe themselves should be left in their own bowel movements for days.

104.    Defendants knowingly manipulated Dr. Morley's testimony and then knowingly manipulated the context in which they placed it such to convey the defamatory meaning.

105.    Defendants additionally published the False and Defamatory Statements and Meanings negligently and with actual malice because they manipulated the sole source quote attributed to Dr. Morley to make it mean something it did not mean and otherwise manipulated the evidence and context to make it seem condemnatory, when it was not.

106.    To the extent Defendants possessed the Administrative Hearing and published the False and Defamatory Statements and Meanings without reviewing it, Defendants engaged in the purposeful avoidance of the truth.

107.    Defendants additionally published the False and Defamatory Statements and Meanings negligently and with actual malice because they purposefully ignored prior news coverage of both the Actual Patient himself and of reports which make obvious that he was not similar to Louis.

108.    Despite being confronted with the falsity of their Episode, Defendants have refused to take any action to clarify the public record.

109.    Defendants published the False and Defamatory Statements and Meanings with the knowledge and intent of harming Dr. Morley.

110.    The False and Defamatory Statements and Meanings are defamatory per se, in that they ascribe to Dr. Morley conduct that adversely impacts his profession as a physician and Physician Advisor and otherwise calls into question his ability to work in the healthcare industry.

111.    Because the False and Defamatory Statements and Meanings are defamatory per se, general damages to Dr. Morley are presumed as a matter of law.

112.    The False and Defamatory Statements and Meanings proximately caused to Dr. Morley significant actual reputational, emotional, and mental damages in an amount exceeding $75,000 and to be determined at trial.

113.    Dr. Morley has also suffered special damages, including by having to retain cocounsel for the purpose of mitigating damages through the investigation of Defendants' Episode, search of the Internet for republications and other resulting statements on social media, and the preparation and delivery of a retraction demand to Defendants.

114.    Defendants knew, intended, and foresaw that their False and Defamatory Statements and Meanings would be republished, including, without limitation, on various national and international platforms and via their own YouTube page.

115.    Defendants published the False and Defamatory Statements and Meanings with common law malice, with the intent to injure and reckless disregard for the rights of Dr. Morley, and Dr. Morley is entitled to an award of punitive damages to deter Defendants from repeating such misconduct in the future.

## <u>PRAYER FOR RELIEF</u>

**WHEREFORE**, a judgment should be entered in favor of plaintiff Dr. Brian Morley, and against Defendants, jointly and severally:

a) Awarding Dr. Morley compensatory damages, in an amount to be determined and in excess of $75,000;

b) Awarding Dr. Morley special damages in an amount to be determined;

c) Awarding Dr. Morley punitive damages in an amount to be determined;

d) Ordering Defendants to remove the False and Defamatory Statements from all platforms under their control, and permanently enjoining Defendants, and those acting in concert with them, from republishing the False and Defamatory Statements;

e) Awarding Dr. Morley his recoverable costs and expenses, including attorney's fees; and

f) Granting Dr. Morley such other and further relief as the Court may deem just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury as to all claims to which it is entitled.  This request is without prejudice to, or waiver of, Plaintiff's right to move for judgment on all issues that may be decided by the Court.


Dated: March 27, 2025

                          FIRESTONE GREENBERGER PLLC

                            /s/ Jordan Greenberger
                          Jordan Greenberger (JG-0316)
                          14 Penn Plaza, 9th Floor
                          New York, NY 10122
                          212-597-2255
                          jg@firegreenlaw.com


                          WADE, GRUNBERG & WILSON, LLC

                          /s/ G. Taylor Wilson
                          Nicole Jennings Wade (*pro hac vice* forthcoming)
                          nwade@wgwlawfirm.com
                          Jonathan D. Grunberg (*pro hac vice* forthcoming)
                          jgrunberg@wgwlawfirm.com
                          G. Taylor Wilson (*pro hac vice* forthcoming)
                          twilson@wgwlawfirm.com

                          729 Piedmont Ave. NE
                          Atlanta, Georgia 30308
                          404-600-1153
                          404-969-4333 (fax)

                          *Attorneys for Plaintiff Dr. Brian Morley*