**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

BRIAN MORLEY, :
  :
                     Plaintiff, :
  :   No. 25-cv-2563-RA
              v. :
  :
JOHN OLIVER and PARTIALLY IMPORTANT :
PRODUCTIONS, LLC, :
  :
              Defendants. :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

**MEMORANDUM OF LAW IN SUPPORT**
**OF DEFENDANTS' MOTION TO DISMISS**

BALLARD SPAHR LLP

Michael Berry
Elizabeth Seidlin-Bernstein
1735 Market Street, 51st Floor
Philadelphia, PA 19103
Tel: (215) 665-8500
Fax: (215) 864-8999
berrym@ballardspahr.com
seidline@ballardspahr.com

Sasha Dudding (application pending)
1675 Broadway, 19th Floor
New York, NY 10019
Tel: (212) 223-0200
Fax: (212) 223-1942
duddings@ballardspahr.com

*Attorneys for Defendants John Oliver and*
*Partially Important Productions, LLC*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ......................................................................................................... ii

PRELIMINARY STATEMENT ...................................................................................................1

STATEMENT OF FACTS ..........................................................................................................3

I.     AmeriHealth's Denial of Care to Nathan McDonald .........................................................3

II.    The "Medicaid" Episode of *Last Week Tonight* .............................................................8

III.   This Lawsuit...........................................................................................................................11

ARGUMENT ................................................................................................................................12

I.     The Fair Report Privilege Protects the Section of the Episode Mentioning
       Morley .............................................................................................................................13

II.    Many of the Challenged Statements Are Not "Of and Concerning" Morley ..................19

III.   Morley Cannot Base His Claim on Constitutionally Protected Opinion ..........................22

IV.    The Complaint Fails to Plausibly Plead Actual Malice, as Required in this
       Case...................................................................................................................................24

V.     Oliver and PIP Are Entitled to Attorney's Fees and Costs..............................................28

CONCLUSION...............................................................................................................................30

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                   **Page(s)**

*1st Amend. Praetorian v. N.Y. Times Co.*,
  2025 WL 949575 (S.D.N.Y. Mar. 28, 2025) ....................................................................21, 28

*Adelson v. Harris*,
  774 F.3d 803 (2d Cir. 2014).................................................................................................29

*Adelson v. Harris*,
  973 F. Supp. 2d 467 (S.D.N.Y. 2013)..................................................................................23

*Alf v. Buffalo News, Inc.*,
  21 N.Y.3d 988 (2013) ..........................................................................................................13

*Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*,
  421 U.S. 240 (1975)..............................................................................................................29

*Barbash v. STX Fin., LLC*,
  2020 WL 6586155 (S.D.N.Y. Nov. 10, 2020)......................................................................22

*Bauer v. Baud*,
  2023 WL 2307413 (S.D.N.Y. Mar. 1, 2023) .......................................................................16

*Biro v. Conde Nast*,
  963 F. Supp. 2d 255 (S.D.N.Y. 2013)..............................................................................26, 28

*Biro v. Conde Nast*,
  807 F.3d 541 (2d Cir. 2015).............................................................................................25, 26

*Bobulinski v. Tarlov*,
  2025 WL 872178 (S.D.N.Y. Mar. 20, 2025) .......................................................................30

*Bobulinski v. Tarlov*,
  758 F. Supp. 3d 166 (S.D.N.Y. 2024).......................................................................... *passim*

*Bose Corp. v. Consumers Union of U.S., Inc.*,
  466 U.S. 485 (1984)..............................................................................................................27

*Brimelow v. N.Y. Times Co.*,
  2021 WL 4901969 (2d Cir. Oct. 21, 2021)...........................................................................25

*BYD Co. v. VICE Media LLC*,
  531 F. Supp. 3d 810 (S.D.N.Y. 2021)...................................................................................27

*Cardone v. Empire Blue Cross & Blue Shield*,
  884 F. Supp. 838 (S.D.N.Y. 1995) .......................................................................................20

*Chau v. Lewis*,
    771 F.3d 118 (2d Cir. 2014)...................................................................................20, 21, 22, 23

*Cholowsky v. Civiletti*,
    69 A.D.3d 110 (2d Dep't 2009) ...........................................................................................17

*Church of Scientology Int'l v. Behar*,
    238 F.3d 168 (2d Cir. 2001)...................................................................................19, 25, 26, 27

*Cooper v. Franklin Templeton Invs.*,
    2023 WL 3882977 (2d Cir. June 8, 2023) ............................................................................8

*Cotton v. Slone*,
    4 F.3d 176 (2d Cir. 1993)......................................................................................................29

*Ctr. for Med. Progress v. Planned Parenthood Fed'n of Am.*,
    551 F. Supp. 3d 320 (S.D.N.Y. July 27, 2021) ...............................................................18, 19

*Dix v. City of N.Y.*,
    2002 WL 31175251 (S.D.N.Y. Sept. 30, 2002)...................................................................14

*Erie R.R. Co. v. Tompkins*,
    304 U.S. 64 (1938)...............................................................................................................28

*Friedman v. Bloomberg L.P.*,
    884 F.3d 83 (2d Cir. 2017)...................................................................................13, 14, 17, 18

*Ganske v. Mensch*,
    480 F. Supp. 3d 542 (S.D.N.Y. 2020)..................................................................................12

*Gilman v. Spitzer*,
    538 F. App'x 45 (2d Cir. 2013) ......................................................................................19, 20

*Goldman v. Reddington*,
    2021 WL 4099462 (E.D.N.Y. Sept. 9, 2021) ......................................................................29

*Heilbut v. Cassava Scis., Inc.*,
    2025 WL 919654 (S.D.N.Y. Mar. 26, 2025) ..................................................................28, 29

*Hodges v. Lutwin*,
    2023 WL 3362836 (2d Cir. May 11, 2023) .....................................................................27, 28

*Immuno AG. v. Moor-Jankowski*,
    77 N.Y.2d 235 (1991) .........................................................................................................22

*Jafar v. Blue Cross Blue Shield of Greater N.Y.*,
    129 Misc. 2d 584 (Sup. Ct. N.Y. Cnty. 1985) .....................................................................14

*Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*,
 585 U.S. 878 (2018) ..................................................................................................25

*Kesner v. Buhl*,
 590 F. Supp. 3d 680 (S.D.N.Y. 2022) .......................................................................25

*Kesner v. Dow Jones & Co.*,
 515 F. Supp. 3d 149 (S.D.N.Y. 2021) .........................................................................8

*Kinsey v. N.Y. Times Co.*,
 991 F.3d 171 (2d Cir. 2021) .......................................................................................14

*Kirch v. Liberty Media Corp.*,
 449 F.3d 388 (2d Cir. 2006) .......................................................................................19

*Levin v. McPhee*,
 119 F.3d 189 (2d Cir. 1997) .......................................................................................22

*McDonald v. E. Hampton Star*,
 10 A.D.3d 639 (2d Dep't 2004) .................................................................................17

*Mestecky v. NYC Dep't of Educ.*,
 791 F. App'x 236 (2d Cir. 2019) ...............................................................................22

*Milkovich v. Lorain J. Co.*,
 497 U.S. 1 (1990) ........................................................................................................22

*MiMedx Grp., Inc. v. Sparrow Fund Mgmt. LP*,
 2018 WL 847014 (S.D.N.Y. Jan. 12, 2018) ..............................................................27

*Mirage Ent., Inc. v. FEG Entretenimientos S.A.*,
 326 F. Supp. 3d 26 (S.D.N.Y. 2018) .........................................................................24

*Misek-Falkoff v. Am. Law. Media, Inc.*,
 300 A.D.2d 215 (1st Dep't 2002) .........................................................................17, 18

*Moore v. Cohen*,
 548 F. Supp. 3d 330 (S.D.N.Y. 2021) ..................................................................23, 24

*N.Y. Times Co. v. Sullivan*,
 376 U.S. 254 (1964) ....................................................................................................25

*O'Loughlin v. Patrolmen's Benev. Ass'n of City of N.Y., Inc.*,
 178 A.D.2d 117 (1st Dep't 1991) .........................................................................22, 23

*Rosa v. Eaton*,
 2024 WL 3161853 (S.D.N.Y. June 25, 2024) ...........................................................23

*Rosen v. Sapir*,
    2021 WL 4523713 (S.D.N.Y. Sept. 30, 2021) ........................................................ 19

*Satanic Temple, Inc. v. Newsweek Mag. LLC*,
    2025 WL 919423 (S.D.N.Y. Mar. 26, 2025) ................................................... 24, 25

*Sparrow Fund Mgmt. LP v. MiMedx Grp., Inc.*,
    2021 WL 12101061 (S.D.N.Y. Sept. 28, 2021) .................................................... 29

*Steinhilber v. Alphonse*,
    68 N.Y.2d 283 (1986) ........................................................................................ 24

*Tacopina v. O'Keeffe*,
    645 F. App'x 7 (2d Cir. 2016) ............................................................................ 13

*Tenney v. Press-Republican*,
    75 A.D.3d 868 (3d Dep't 2010) .................................................................... 16, 17

*Test Masters Educ. Servs., Inc. v. NYP Holdings, Inc.*,
    2007 WL 4820968 (S.D.N.Y. Sept. 18, 2007) .............................................. 13, 19

*Themed Rests., Inc. v. Zagat Surv., LLC*,
    4 Misc. 3d 974 (Sup. Ct. N.Y. Cnty. 2004) ....................................................... 27

*Tolbert v. Smith*,
    790 F.3d 427 (2d Cir. 2015) ............................................................................... 17

*Wheeler v. Twenty-First Century Fox*,
    322 F. Supp. 3d 445 (S.D.N.Y. 2018) ............................................................... 24

**Statutes**

N.Y. Civ. Rights Law § 70-a ......................................................................................... 28

N.Y. Civ. Rights Law § 74 ............................................................................................ 13

N.Y. Civ. Rights Law § 76-a ............................................................................. 24, 26, 28

**Other Authorities**

Fed. R. Evid. 201 ........................................................................................................... 8

Matthew L. Schafer & Tanvi Valsangikar, *The Application of the New York Anti-
    SLAPP Scheme in Federal Court*, 2 J. Free Speech L. 573 (2023) ................... 25, 29

## PRELIMINARY STATEMENT

"I would allow him to be a little dirty for a couple days."  That is how Plaintiff Brian
Morley, a medical doctor, testified at an administrative hearing about Nathan McDonald, an
Iowa man with cerebral palsy who could not wipe himself after bowel movements.  At the time,
Morley worked for AmeriHealth Caritas, a private managed care organization responsible for
administering Medicaid services in Iowa.  AmeriHealth had cut McDonald's home health aide
visits from twice daily to less than once per day against the orders of his doctor.  Morley testified
on behalf of AmeriHealth in support of that decision, saying that McDonald did not need to be
cleaned every day, even to wash off feces.  McDonald appealed AmeriHealth's denial of benefits
to a court, quoting Morley's statement in the first line of his appeal brief.  When the briefing on
that appeal was complete, and just two days before the court hearing, AmeriHealth voluntarily
reversed itself and restored McDonald's twice-a-day home visits.

In April 2024, the award-winning television show *Last Week Tonight with John Oliver*
broadcast an episode about problems in the Medicaid system.  The show, hosted by comedian
John Oliver and known for its meticulously researched and satirical perspective on current
affairs, included an audio clip of Morley's testimony during a roughly five-minute section
discussing the privatization of Medicaid in states like Iowa.  Part of that section focused on the
case of Louis Facenda, another Iowa man with cerebral palsy whose home visits were cut by
AmeriHealth around the same time as McDonald's.  As the show explained, when Facenda's
care was cut, he went without regular in-home bathing and diaper changing.  To demonstrate
"just what the corporate thinking was about the necessity of keeping people clean," Oliver cited
Morley's testimony "about a similar patient," *i.e.*, McDonald.  After playing the recording of
Morley's testimony, Oliver commented: "Look, I'll be honest, when I first heard that, I thought
that had to be taken out of context.  There is no way a doctor, a licensed physician, would testify

in a hearing that he thinks it's okay if people have shit on them for days.  So, we got the full hearing, and I'm not going to play it for you, I'm just going to tell you:  He said it, he meant it, and it made me want to punch a hole in the wall."

Morley has now sued Oliver and Partially Important Productions, LLC ("PIP"), the company that produces the show (together, "*Last Week Tonight*").  He claims that the Medicaid episode defamed him by implying that he "illegally denied care" to both McDonald and Facenda, and that he testified it was acceptable for individuals to "be left sitting in their own bowel movements for days."  But Morley's claim fails at the outset because *Last Week Tonight*'s reporting was fundamentally accurate.

Morley's Complaint should be dismissed as a matter of law for multiple independent reasons.  First, the episode accurately conveyed the content of Morley's testimony in an official proceeding and is therefore protected by the fair report privilege.  Second, a number of the statements to which Morley objects are not about him at all.  Third, many of the statements are constitutionally protected opinion.  Fourth, even if the statements were not accurate, Morley's claim would fail because he does not—and cannot—plead facts sufficient to show *Last Week Tonight* made these statements with actual malice.  In addition, because Morley is pursuing this lawsuit "without a substantial basis in fact and law," Oliver and PIP are entitled to recover their attorney's fees under the New York law protecting them from strategic litigation against public participation (the "anti-SLAPP law").

STATEMENT OF FACTS[1]

I.   <u>**AmeriHealth's Denial of Care to Nathan McDonald**</u>

In 2016, Iowa began using private managed care organizations ("MCOs") to administer Medicaid services.  *Report on a Review of Medicaid Member Appeals and Managed Care Organization Contract Compliance*, Iowa Office of Auditor of State (Oct. 20, 2021) ("Auditor's Report") (Berry Decl. Ex. B).  Nathan McDonald,[2] a then-32-year-old Iowa resident with cerebral palsy, previously received twice-daily home health aide visits.  Berry Decl. Ex. D ("ALJ Decision") at 2-3.  After AmeriHealth took over, it cut McDonald's home visits to just 50 per 60 days—less than daily.  *Id.* at 4; Compl. ¶ 63.  Morley was the medical director at AmeriHealth responsible for denying the additional 70 visits McDonald's own doctor had ordered.  ALJ Decision at 5.

McDonald challenged the denial of benefits in an administrative proceeding.  *See McDonald v. Iowa Dep't of Hum. Servs.*, No. CVCV54836 (Polk Cnty. Dist. Ct. Iowa, filed Sept. 1, 2017); Berry Decl. Ex. F ("Petition").  He presented evidence that, due to his disability, he could not walk on his own, was unable to reach some parts of his body, and had difficulty grasping objects.  Berry Decl. Ex. C ("Hearing") at 1:36:03-1:39:01.  He moved around his apartment by crawling and used a wheelchair or walker when outside.  ALJ Decision at 4.  He needed assistance to perform many routine tasks, including preparing meals, bathing, shaving, brushing his teeth, and dressing himself.  *Id.* at 3.  Due to the limited dexterity in his hands, he

---

[1] Except where otherwise noted, *Last Week Tonight* assumes the Complaint's allegations are true solely for purposes of this motion to dismiss.

[2] Because McDonald previously participated in news coverage about his disability and care needs, and the records from his legal proceedings against AmeriHealth are public, there is no privacy concern that would prevent the use of his name in this case.

was "not able to wipe himself" after a bowel movement. Hearing at 1:38:47-1:39:01. He lived

with two roommates who also had disabilities and were unable to assist him. ALJ Decision at 2.

Morley—who had never met or examined McDonald—testified on behalf of

AmeriHealth at McDonald's administrative hearing. Hearing at 13:18-1:27:46. During his

testimony, Morley responded to a series of questions from McDonald's attorney about the

medical necessity of cleaning a patient's skin after defecation. *Id.* at 40:14-45:16. When asked

what concerns might arise for someone who was "unable to cleanse themselves adequately after

having a bowel movement," Morley replied:

> If feces were left on the skin for an extended period of time in someone that's
> totally immobile, you can get significant skin breakdown. But if feces are left on
> the skin for several hours, or even a day, and the feces are removed the next day
> in someone that's mobile and is not confined to a bed, then it would just be a
> matter of washing the feces off.

*Id.* at 40:15-41:42.

McDonald's attorney then asked whether it was "a standard of care to try to clean

up the [bowel movement] within a short period of time," and Morley testified:

> No, I mean, there are likely people running, you know, walking around in society
> today that have, you know, bowel movements that aren't clean and they have
> feces on their skin for whatever reason, but they're, you know, for the most part
> they're mobile, and they're not laying in it, like someone who might be elderly,
> who's immobile with concomitant medical problems like diabetes.

*Id.* at 42:45-43:45. When pressed further on this point, Morley continued:

> In certain cases, yes, with a patient with significant comorbidities, you would
> want to have someone wiping them and getting the feces off. But, like I said,
> people have bowel movements every day where they don't completely clean
> themselves, and we don't fuss over it too much. People are allowed to be dirty.
> It's when the dirty and the feces and the urine interfere with, you know, medical
> safety, like in someone who has concomitant comorbidities, that you worry, but
> not in this specific case. You know, I would allow him to be a little dirty for a
> couple days.

*Id.* at 44:07-45:16.

Later in the hearing, a registered nurse who supervised McDonald's regular caregiver and who had cared for McDonald herself testified about his medical needs. *Id.* at 1:28:05-1:32:02. She explained that McDonald is unable to bathe himself without assistance because he cannot "wash everywhere"; he "can't grasp the soap or the washcloth"; and "when he does use the restroom, he is not able to wipe himself and become clean." *Id.* at 1:38:34-54. Asked whether it was "appropriate for a person to remain with bowel movement on their skin for a 24-hour period," she responded, "No, I would not consider that appropriate care of a patient." *Id.* at 1:48:26-49. Following the hearing, the administrative law judge affirmed the denial of benefits. Compl. ¶ 84; ALJ Decision.

McDonald filed a lawsuit to challenge the administrative ruling in Iowa state court, arguing that AmeriHealth had denied medically necessary care in violation of state and federal law. *See* Petition ¶¶ 27-29. The very first lines of his appeal brief quoted Morley's testimony and explained that Morley "would allow Mr. Nathan McDonald, a Medicaid member who suffers from cerebral palsy, asthma, and hypertension, to be unclean after bowel movements for up to 'a couple of days.'" Berry Decl. Ex. G ("Petitioner's Br.") at 2. In its response, AmeriHealth argued that "McDonald's inability to always completely clean himself after toilet usage" did "not automatically entitle him" to receive twice-daily home visits, quoting extensively from Morley's testimony on the issue. Berry Decl. Ex. H ("Respondent's Br.") at 20; *see also id.* at 2 ("the mere fact that Mr. McDonald may endure some uncleanliness does not mean that the requested services are medically necessary"). According to AmeriHealth, McDonald was making "an emotional plea based neither on the law nor medical necessity." *Id.* at 20. Nonetheless, after briefing was complete, and just two days before the court heard the

case, AmeriHealth reversed its decision and restored McDonald's benefits to provide him 120

home health aide visits over 60 days.  *See* Berry Decl. Ex. I ("Joint Motion to Continue") ¶¶ 4-5,

Ex. A.  As a result, McDonald dismissed the lawsuit.  *See* Berry Decl. Ex. J.

      The *Des Moines Register* covered McDonald's dispute with AmeriHealth, including

Morley's testimony, as part of an investigation into improper denials of medical care by MCOs

in Iowa.  *See* Jason Clayworth, *'An endemic problem'?*, Des Moines Register (Jan. 14, 2018)

(Berry Decl. Ex. K); Jason Clayworth, *An Iowa Medicaid patient who was denied care because*

*he could be 'a little dirty' wins in the end*, Des Moines Register (Feb. 9, 2018) (Berry Decl. Ex.

L).  In its reporting about McDonald's case, the newspaper quoted the same testimony by

Morley:



Berry Decl. Ex. K.

Morley's testimony also was featured in a video report about Iowa's Medicaid system on Al Jazeera's AJ+ channel. *What Happens When You Privatize Medicaid?*, AJ+ (Aug. 26, 2018) (Berry Decl. Ex. M). That report focused on another patient in Iowa with cerebral palsy named Louis Facenda, whose services also were cut by AmeriHealth around the same time. The AJ+ report included an audio clip and transcript of Morley's testimony to explain how "private companies justified denying diaper changing services," as well as the reactions of Facenda and his mother upon hearing that testimony:



 

*Id.* at 7:02-33.

## II.    The "Medicaid" Episode of *Last Week Tonight*

On April 14, 2024, *Last Week Tonight* broadcast an episode focusing on problems endemic to the Medicaid system.  Compl. ¶ 41; Berry Decl. Ex. A ("Episode").[3]  Hosted by John Oliver, the show is "[k]nown for hard hitting journalism while also garnering laughs."  Compl. ¶¶ 14-16.

A roughly five-minute portion of the 38-minute Episode explored the role of MCOs in the Medicaid system.  Episode at 27:26-32:42.  "The most infuriating thing about MCOs," Oliver said in introducing that portion of the Episode, "is that, as with so many players in our for-profit healthcare system, they are incentivized to cut costs at the expense of necessary care."  *Id.* at 29:21-32.  He explained that "MCOs get paid a set monthly amount per person, meaning they get a fixed rate, so their profit is whatever they don't spend on patients."  *Id.* at 29:33-43.  "In state after state, there've been heartbreaking stories of MCOs denying care and prioritizing cost savings over patients," he said, highlighting news coverage from Texas, Florida, and Iowa.  *Id.* at 29:45-57.

"Just to focus on Iowa," Oliver went on, the state "transitioned to using MCOs to run its Medicaid program in 2016."  *Id.* at 29:58-30:03.  Citing an Auditor's Report from the Iowa state government, Oliver said that in the first three years after Iowa began using MCOs, "there was a nearly 900% increase in members being illegally denied services or care":

---

[3] The Court can consider the Auditor's Report, the records of McDonald's Iowa proceedings, the news reports, and the Episode in deciding this motion because they are incorporated by reference in the Complaint and integral to Morley's claim.  *See* Compl. ¶¶ 4, 85 (citing and quoting Auditor's Report); *id.* ¶¶ 57 n.1 (explaining that statements about McDonald in Complaint rely on "public records"); *id.* ¶¶ 72-84 (discussing administrative hearing); *id.* ¶ 107 (referencing news reports); *id.* ¶¶ 43, 48 (linking to and quoting Episode); *Cooper v. Franklin Templeton Invs.*, 2023 WL 3882977, at *1 n.2 (2d Cir. June 8, 2023); *Kesner v. Dow Jones & Co.*, 515 F. Supp. 3d 149, 159 n.1, 174 n.5 (S.D.N.Y. 2021).  The public records are also judicially noticeable.  *See* Fed. R. Evid. 201(b)(2).



*Id.* at 30:05-10.

Returning to the theme of MCOs' profit motive, Oliver continued, "And some of the cost-cutting was absolutely enraging." *Id.* at 30:10-15. As an example, Oliver discussed the case of Louis Facenda, "who has cerebral palsy and was living with his mother. He needs a lot of care, which, prior to the switch over, was provided by Medicaid. But once an MCO got involved, he lost a lot of what he'd been getting, starting with his medications." *Id.* at 30:15-29. The Episode then showed footage from the AJ+ report about Facenda, which explained that his daily nurse visits were also cut, "so for six weeks Louis went without the in-home bathing and diaper changing he'd had for years." *Id.* at 30:39-45. The AJ+ report included an interview with Facenda's mother, who described the situation as "a nightmare." *Id.* at 30:29-33.

"That's obviously maddening," Oliver said when the AJ+ clip ended. "And it doesn't get any better when you hear a doctor at AmeriHealth, the MCO that took over in Iowa, explaining in a hearing *about a similar patient* just what the corporate thinking was about the necessity of keeping people clean." *Id.* at 31:01-15 (emphasis added). The Episode then played the clip from the AJ+ report with the testimony Morley gave during McDonald's administrative hearing, accompanied by the transcript from that report on screen:

9



*Id.* at 31:15-28.

The studio audience groaned in response, and Oliver said, "Look, I'll be honest, when I first heard that, I thought that has to be taken out of context. There is no way a doctor, a licensed physician, would testify in a hearing that he thinks it's okay if people have shit on them for days. So, we got the full hearing, and I'm not going play it for you, I'm just going tell you: He said it, he meant it, and it made me want to punch a hole in the wall. And just watch what happens when Louis and his mom were told about what that doctor just said." *Id.* at 31:29-53.

The Episode cut back to the AJ+ interview with Facenda's mother, who said, "I would spit in his face, to be honest," while her son audibly scoffed in the background. "Yeah, right Louis, you like to be clean. I think it's horrible. I don't have words for that":

 

*Id.* at 31:54-32:06.

The Episode then returned to Oliver, who said, "Yeah, I'm kind of struggling for words too," and quipped that "Louis kind of did nail it there by blowing that raspberry." *Id.* at 32:06-13. "But if I absolutely had to put it into words," Oliver went on, as the transcript of Morley's testimony reappeared on the screen:



"I guess I'd say, 'Fuck that doctor with a rusty canoe, I hope he gets tetanus of the balls.' And if he has a problem with my language there, I'd say, 'I'm allowed to be dirty. People are allowed to be a little dirty sometimes.' Apparently that's doctor's fucking orders. And while legally, I have to tell you, AmeriHealth eventually restored Louis's service, it is a disgrace it was even a fight to begin with." *Id.* at 32:18-42.

## III.    <u>This Lawsuit</u>

While researching the Episode prior to its release, a Senior News Producer for *Last Week Tonight* contacted Morley for comment. Compl. ¶ 58. Morley asked the producer whether they had listened to the full three-hour administrative hearing in McDonald's case, and the producer confirmed that they had. *Id.* ¶ 59. Then, rather than offer comment, Morley insisted that the

producer facilitate an in-person meeting in Iowa between him and McDonald to allow him "to explain his testimony." *Id.* ¶ 89. The producer declined to arrange such a meeting. *Id.* ¶ 90.

In October 2024, nearly six months after the Episode first aired, Morley sent *Last Week Tonight* a retraction demand. *Id.* ¶ 93. The show declined to retract the Episode and instead provided Morley with public records from McDonald's proceedings against AmeriHealth to demonstrate the Episode's accuracy. *Id.* ¶¶ 2, 57 n.1, 94.

On March 28, 2025, Morley filed this lawsuit, asserting a single claim for defamation against Oliver and PIP based on nine "False and Defamatory Statements." Compl. ¶ 48(a)-(j).[4] Morley contends that these statements and other elements of the Episode conveyed two "False and Defamatory Meanings": (1) "Morley illegally denied care to Louis and/or the alleged 'similar' individual subject of his testimony," and (2) "Morley testified that it is 'okay' for individuals who wear diapers and/or cannot bathe themselves 'to have shit on them for days' and to otherwise be left sitting in their own bowel movements for days." *Id.* ¶ 52. He seeks "actual reputational, emotional, and mental damages," as well as special damages stemming from his retention of counsel. Compl. ¶¶ 112-13.

## ARGUMENT

As this Court has recognized, "New York courts encourage the resolution of defamation claims at the pleading stage, so as not to protract litigation through discovery and trial and thereby chill the exercise of constitutionally protected freedoms." *Ganske v. Mensch*, 480 F. Supp. 3d 542, 551 (S.D.N.Y. 2020) (Abrams, J.) (cleaned up). This case is one that should end at the pleading stage. The Episode was fundamentally accurate.

---

[4] For the Court's convenience, each of those statements is listed in an Appendix (Berry Decl. Ex. N), along with the grounds on which the statements fail to state a claim.

Morley cannot state a claim as a matter of law for several independent reasons. Furthermore, Oliver and PIP should be awarded their attorney's fees under New York's anti-SLAPP law for being subjected to a lawsuit with no substantial basis in fact or law.

**I.**    **The Fair Report Privilege Protects the Section of the Episode Mentioning Morley.**

The portion of the Episode addressing Morley's testimony is fully protected under New York's statutory fair report privilege.  That privilege provides that a "civil action cannot be maintained against any person, firm or corporation, for the publication of a fair and true report of any judicial proceeding, legislative proceeding or other official proceeding."  N.Y. Civ. Rights Law § 74.

 "A statement is deemed a fair and true report if it is substantially accurate, that is if, despite minor inaccuracies, it does not produce a different effect on a reader than would a report containing the precise truth."  *Friedman v. Bloomberg L.P.*, 884 F.3d 83, 93 (2d Cir. 2017) (cleaned up).  New York courts have adopted a "liberal interpretation of the 'fair and true report' standard" in order "to provide broad protection to" accounts of official proceedings.  *Id*.  The language used in such accounts "must be accorded some degree of liberality" and "should not be dissected and analyzed with a lexicographer's precision."  *Alf v. Buffalo News, Inc.*, 21 N.Y.3d 988, 990 (2013).  Moreover, as the Second Circuit has noted in applying the privilege, a news report "is, by its very nature, a condensed report of events which must, of necessity, reflect to some degree the subjective viewpoint of its author."  *Tacopina v. O'Keeffe*, 645 F. App'x 7, 8 (2d Cir. 2016).  Whether a report is protected by the privilege is a question of law for the court to decide.  *Test Masters Educ. Servs., Inc. v. NYP Holdings, Inc.*, 2007 WL 4820968, at *3 (S.D.N.Y. Sept. 18, 2007).

The discussion of Morley's testimony in the Episode is subject to the fair report privilege. The privilege applies to reports about administrative hearings like those in which Morley

testified. *See, e.g.*, *Dix v. City of N.Y.*, 2002 WL 31175251, at *12 (S.D.N.Y. Sept. 30, 2002)

(zoning hearing); *Jafar v. Blue Cross Blue Shield of Greater N.Y.*, 129 Misc. 2d 584, 585-89

(Sup. Ct. N.Y. Cnty. 1985) (Medicare hearing), *aff'd*, 125 A.D.2d 1015 (1st Dep't 1986).  And,

the privilege is implicated when, as in this case, "the ordinary viewer or reader can determine

from the publication itself that the publication is reporting on [the] proceeding."  *Kinsey v. N.Y.*

*Times Co.*, 991 F.3d 171, 179 (2d Cir. 2021) (cleaned up).  Here, Oliver told viewers he was

quoting testimony given "in a hearing" by "a doctor at AmeriHealth, the CMO that took over in

Iowa," then "play[ed] a snippet of his testimony, and show[ed] a transcript."  Compl. ¶ 48(e)-(f).

The on-screen text clearly labeled the quotes as being from "Brian Morley, AmeriHealth,

Testimony in Administrative Hearing."  *Id.* ¶ 48(g); *see Kinsey*, 991 F.3d at 179 (privilege

applied where the challenged "article note[d] that it [was] reporting on a specific court

proceeding," "quote[d] from" it, and "include[d] an image of" part of one filing).  Morley

therefore bears the burden of establishing that the Episode is not "substantially accurate," which

he cannot do.  *Friedman*, 884 F.3d at 93.

*First*, to the extent the show suggested "Morley testified that it is 'okay' for individuals

who . . . cannot bathe themselves 'to have shit on them for days,'" Compl. ¶ 52, that is a fair and

accurate description of Morley's testimony in McDonald's case.  *See supra* at 4-5.  The hearing

and records from McDonald's appeal confirm that leaving feces "on the skin" is precisely what

Morley meant by "be[ing] a little dirty."  He testified that in McDonald's "specific case"—which

involved a patient who could neither bathe himself nor wipe himself after a bowel movement—

"I would allow him to be a little dirty for a couple days."  Compl. ¶ 79.  Indeed, *AmeriHealth's*

*own lawyer* acknowledged that Morley testified "he would allow Mr. McDonald to go up to a

day or two without being cleaned after using the restroom."  Respondent's Br. at 20; *see also*

Hearing at 2:59:13-32 ("it seems like the best argument that they've come up with is that he doesn't wipe himself clean enough after using the toilet, and as Dr. Morley pointed out, that probably goes for a lot of people walking around town as we speak here"). To use Oliver's words, the proceedings established that Morley "said it," and "he meant it." Episode at 31:41-46. Both this alleged implication and at least four of the specific alleged "False and Defamatory Statements" are privileged. *See* Appendix.

To the extent Morley claims that the Episode suggested this testimony referred to someone who "wear[s] diapers," Compl. ¶ 52, that alleged implication is unreasonable. *See Bobulinski v. Tarlov*, 758 F. Supp. 3d 166, 174 (S.D.N.Y. 2024) ("Under a defamation-by-implication theory, Plaintiff must make a rigorous showing that the statement as a whole can be reasonably read both to impart a defamatory inference and to affirmatively suggest that the author intended or endorsed that inference." (cleaned up)). Unlike the AJ+ report, *see supra* at 7, the Episode never suggested that Morley's testimony was about individuals who wear diapers. Instead, Oliver made clear that the testimony only reflected the "corporate thinking" about "the necessity of keeping people clean." Episode at 31:01-15. That was precisely the subject of Morley's testimony quoted in the Episode, which he gave on behalf of AmeriHealth during the period it cut both men's care. Nor did the Episode imply that Morley testified people could be "left sitting in their own bowel movements for days," as Morley claims. Compl. ¶ 52. Rather, Oliver plainly stated that Morley testified he "thinks it's okay if people have shit *on them* for days," Episode at 31:37-41 (emphasis added), which is exactly what Morley said in his testimony about "the necessity of keeping people clean" in a hearing about a patient who could not wipe himself, *id.* at 31:01-15.

15

Morley nevertheless objects to the Episode's use of his testimony in two respects. Initially, he complains about Oliver's description of McDonald as "similar" to Facenda, *id.* at 31:08-10, claiming that the two patients were not similar "in any material sense," Compl. ¶ 70. But, Morley exaggerates their differences and downplays their similarities. Both Facenda and McDonald were Iowans who had cerebral palsy and depended on Medicaid services managed by AmeriHealth. *See* ALJ Decision at 2; Episode at 30:15-29. Like Facenda, McDonald could not walk on his own and used a wheelchair. ALJ Decision at 7; Compl. ¶ 71; Episode at 30:38-45. To get around in his apartment, he could only crawl. ALJ Decision at 7. Both men required home health aide visits for basic personal care, including to clean them. ALJ Decision at 2-5; Compl. ¶ 71; Episode at 30:36-45. Although McDonald did not wear diapers like Facenda, he was unable to wipe himself after bowel movements. ALJ Decision at 5; Compl. ¶ 71. And, AmeriHealth cut both patients' home care visits during the same period. ALJ Decision at 5, 8; Compl. ¶ 48(c). In sum, although McDonald and Facenda were not identical, they were "similar" by any ordinary definition, which is all the fair report privilege requires. *See* Merriam-Webster, https://www.merriam-webster.com/dictionary/similar (defining "similar" as "having characteristics in common"); *Bauer v. Baud*, 2023 WL 2307413, at *7-8 (S.D.N.Y. Mar. 1, 2023) (fair report privilege applied despite alleged "technical inaccuracies" in article, including describing individual as having "a skull fracture" instead of "'significant head and facial trauma' and bruising").

Morley next complains that the Episode is inaccurate because it omitted portions of his testimony about patients with "concomitant comorbidities." Compl. ¶¶ 79-82. But, the Episode does not lose the protection of the privilege merely because it did not include testimony that Morley would have preferred to be broadcast. *See, e.g.*, *Tenney v. Press-Republican*, 75 A.D.3d

868, 869 (3d Dep't 2010) (privilege applied even though article "focuse[d] on only one aspect" of lawsuit); *Cholowsky v. Civiletti*, 69 A.D.3d 110, 115 (2d Dep't 2009) (there is "no requirement that the publication report the plaintiff's side of the controversy"); *McDonald v. E. Hampton Star*, 10 A.D.3d 639, 640 (2d Dep't 2004) (privilege applied even though article about dismissal of lawsuit failed to report that plaintiff filed amended complaint).

Here, Morley did testify he would allow a patient who could not wipe himself after a bowel movement "to be a little dirty for a couple days," which is what the Episode reported. While Morley testified that more frequent cleaning would be necessary in cases where a patient was "totally immobile," "confined to a bed," "laying in" feces, and had "concomitant medical problems like diabetes," Compl. ¶¶ 80-81 (quoting Morley's testimony), he also stated that frequent cleanings are not necessary for people who "don't completely clean themselves" if they are "mobile," *id.* ¶¶ 79-81 (quoting Morley's testimony). But, unlike those individuals who are "walking around in society" and might have some "feces on their skin" because they "may not wipe perfectly," McDonald could not walk on his own and could not wipe himself. *Id.* ¶ 80 (quoting Morley's testimony). Simply stated, listening to the full hearing, including Morley's testimony justifying the denial of twice-daily home health visits for McDonald to ensure he was cleaned following bowel movements (and received other basic personal care), would not have produced a materially different effect on the viewer than watching the Episode. *Friedman*, 884 F.3d at 93; *see also, e.g.*, *Tolbert v. Smith*, 790 F.3d 427, 440 (2d Cir. 2015) (privilege protected statement that principal "closed" school kitchen due to sanitation issues where health department had "prohibited its reopening without an inspection"); *Misek-Falkoff v. Am. Law. Media, Inc.*, 300 A.D.2d 215, 216 (1st Dep't 2002) (privilege protected report stating plaintiff had "filed a

lawsuit alleging that she was discriminated against because of her mental disability" when her lawsuit instead concerned a "neurological disorder").

**Second**, Morley's contention that the Episode implied he "illegally denied care to" Facenda or McDonald, Compl. ¶ 52, is also unreasonable. *Bobulinski*, 758 F. Supp. 3d at 174. As to Facenda, the Episode never suggested that Morley was involved in his case. Rather, the Episode made clear that Morley's testimony concerned a "similar patient," and the reference to Morley was only regarding "the corporate thinking . . . about the necessity of keeping people clean." Episode at 31:01-15. Nothing connected Morley to the denial of Facenda's coverage.

As to McDonald, the Episode never suggested that Morley's decision to cut his home visits was illegal, but even if the Episode could be understood that way, the alleged implication would be "substantially accurate." *Friedman*, 884 F.3d at 93. Morley argues that the ALJ's affirmance of his denial of services to McDonald "means a legally correct decision was made." Compl. ¶¶ 4, 85 (quoting Auditor's Report at 4, 15). Yet, this argument ignores that McDonald appealed the denial of services in court, and that AmeriHealth *reversed* his denial, voluntarily restoring all of McDonald's home visits shortly before the court could issue a ruling. Joint Mot. to Continue ¶¶ 4-5, Ex. A.[5] Thus, AmeriHealth itself apparently concluded that Morley's denial of services was improper, and reviewing the court records would not have produced a materially different effect on the viewer than watching the Episode. *Friedman*, 884 F.3d at 93.

Finally, Oliver's injection of opinion, humor, and "outrage" into his presentation of Morley's testimony, Compl. ¶ 1, does not take it outside the protection of the fair report privilege. *See Ctr. for Med. Progress v. Planned Parenthood Fed'n of Am.*, 551 F. Supp. 3d 320,

---

[5] Morley also does not dispute AmeriHealth reversed its denial of services to Facenda. *See* Episode at 32:36-40.

329 (S.D.N.Y. July 27, 2021) (privilege extends to reports of official proceedings "that are mixed with commentary or opinion"), *aff'd*, 2022 WL 1013982 (2d Cir. Apr. 5, 2022); *Rosen v. Sapir*, 2021 WL 4523713, at *11 (S.D.N.Y. Sept. 30, 2021) (press release was protected by privilege "notwithstanding its arguably 'more colorful' language"); *Test Masters*, 603 F. Supp. 2d at 589 (newspaper "is permitted some drama in grabbing its reader's attention" and "need not choose the most delicate word available").

Because the section of the Episode about Morley's testimony is a substantially accurate report of testimony in an official proceeding, it is absolutely privileged.  On this basis alone, the Complaint should be dismissed with prejudice.

## II.    **Many of the Challenged Statements Are Not "Of and Concerning" Morley.**

Morley's claim as to at least five of the alleged "False and Defamatory Statements" should be dismissed for the independent reason that they are not about Morley at all.  Compl. ¶ 48(a)-(d), (j).  Like all defamation plaintiffs, Morley bears the burden of establishing that the statements at issue are "of and concerning" him—in other words, that viewers of the Episode would reasonably understand the statements to be referring to him.  *See Gilman v. Spitzer*, 538 F. App'x 45, 47 (2d Cir. 2013).  This requirement "stands as a significant limitation on the universe of those who may seek a legal remedy for communications they think to be false and defamatory."  *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 399-400 (2d Cir. 2006).  Whether a challenged statement is of and concerning the plaintiff is a question of law that "should ordinarily be resolved at the pleading stage."  *Church of Scientology Int'l v. Behar*, 238 F.3d 168, 173 (2d Cir. 2001).

Here, Morley challenges several statements discussing MCOs generally.  Compl. ¶ 48(a)-(d), (j); *see also* Appendix.  Black-letter law provides that allegedly defamatory words directed at a corporate entity cannot give rise to a claim by individuals associated with the entity.  *See, e.g.*,

*Chau v. Lewis*, 771 F.3d 118, 129 (2d Cir. 2014) (statement that "only speaks about a group of which the plaintiff is a member" is not of and concerning that member); *Gilman*, 538 F. App'x at 47 (allegations of illegal activity by insurance company were not of and concerning its senior executive); *Cardone v. Empire Blue Cross & Blue Shield*, 884 F. Supp. 838, 847-48 (S.D.N.Y. 1995) (allegations that insurance company had sent erroneous data to regulators were not of and concerning its former CEO).

Many of the statements challenged by Morley do not mention him, and none of those statements can reasonably be understood as referring to him:

- Oliver's statement that MCOs "are incentivized to cut costs at the expense of necessary care" because "their profit is whatever they don't spend on patients" was about the general role of MCOs as "players in our for-profit healthcare system," not Morley.  Episode at 29:28-43.

- Oliver's statement that "[i]n state after state, there've been heartbreaking stories of MCOs denying care and prioritizing cost savings over patients" referred to many different MCOs around the country, again not Morley.  *Id.* at 29:45-58.

- Oliver's statement that Iowa experienced "a nearly 900% increase in members being illegally denied services or care" after "it transitioned to using MCOs" also said nothing about Morley.  *Id.* at 29:58-30:11; *supra* at 8-9.  Indeed, when reporting that fact, the Episode showed the first page of the Auditor's Report, reinforcing that Oliver was discussing an aggregate figure relating to more than one MCO in Iowa.  *Id.* at 30:06-11.

These types of "generalized reference[s]" to MCOs "cannot reasonably be read to directly or impliedly refer to" Morley.  *Gilman*, 538 F. App'x at 47.

20

In addition, Morley's name was not mentioned until a full minute after the discussion of MCOs generally, and the reference to him was in an entirely different context. At that point, Oliver was discussing the cutbacks in Facenda's care by AmeriHealth, and he explicitly told the audience that Morley's testimony was an indication of "what the corporate thinking was about the necessity of keeping people clean" at the time. Episode at 31:01-15. In any case, identifying an individual as one example in a critique of an entire industry does not attribute to the individual all of the industry's conduct. *See, e.g.*, *Chau*, 935 F. Supp. 2d 644, 660 (S.D.N.Y. 2013) (rejecting plaintiff's contention that "every unflattering comment made about CDO managers" in book "is a personal libelous accusation concerning [plaintiff] simply because [plaintiff] is a CDO manager who appears as a central representative character"), *aff'd*, 771 F.3d 118; *1st Amend. Praetorian v. N.Y. Times Co.*, 2025 WL 949575, at *13 (S.D.N.Y. Mar. 28, 2025) ("[A]lthough Plaintiff is mentioned in parts of the articles, that does not mean that all of the statements concern Plaintiff; this is even true when the plaintiff is described as a part of this larger group or an example of a member of the group.").

Similarly, no reasonable viewer would understand Oliver's statements about the initial denial of care to Facenda "once an MCO got involved" to be about Morley. Episode at 30:14-29. As Morley pleads, he was never involved in Facenda's case, Compl. ¶¶ 66-67, and nothing in the Episode suggested otherwise. Oliver expressly stated he was quoting testimony from the case of a "similar patient" to Facenda, and the Episode depicted Facenda and his mother's reaction when told about the testimony from McDonald's case during the AJ+ interview. Episode at 31:01-15, 31:52-32:06.

Accordingly, Morley's defamation claim should be dismissed as to these five statements for failure to meet the essential "of and concerning" requirement. Compl. ¶ 48(a)-(d), (j).

**III.    Morley Cannot Base His Claim on Constitutionally Protected Opinion.**

Most of the statements challenged by Morley also contain constitutionally protected opinion, which cannot give rise to a defamation claim.  Compl. ¶ 48(a)-(b), (e), (h)-(j).  Under the First Amendment, a statement that does not "imply assertions of objective fact" is nonactionable opinion, and the New York State Constitution provides even broader protection for opinion.  *Levin v. McPhee*, 119 F.3d 189, 196 (2d Cir. 1997) (discussing *Milkovich v. Lorain J. Co.*, 497 U.S. 1, 18, 20 (1990), and *Immuno AG. v. Moor-Jankowski*, 77 N.Y.2d 235, 248-55 (1991)).  A statement that is "not capable of being objectively characterized as true or false" is one form of protected opinion.  *Mestecky v. NYC Dep't of Educ.*, 791 F. App'x 236, 239 (2d Cir. 2019); *see also, e.g.*, *Chau*, 771 F.3d at 129 (epithets such as "sucker" and "fool" were opinion).  Another is a statement that "either discloses the facts on which it is based or does not imply the existence of undisclosed facts."  *Levin*, 119 F.3d at 197.  Whether a statement constitutes opinion is a legal question for the court to decide.  *Chau*, 771 F.3d at 128.  In making this threshold determination, courts properly consider the statement itself as well as its "immediate context and the broader social context."  *Levin*, 119 F.3d at 197.

Much of the language with which Morley takes issue simply expresses *Last Week Tonight*'s subjective views of MCOs.  Statements describing the conduct of MCOs as "infuriating," Compl. ¶ 48(a), "heartbreaking," *id.* ¶ 48(b), and "absolutely enraging," *id.* ¶ 48(c), and Facenda's case as "obviously maddening," *id.* ¶ 48(e), and "a disgrace," *id.* ¶ 48(j), are incapable of being proved true or false.  Descriptors of this sort are textbook examples of protected opinion, which viewers would understand to be conveying *Last Week Tonight*'s perspective and not objective facts.  *See, e.g.*, *Barbash v. STX Fin., LLC*, 2020 WL 6586155, at *4 (S.D.N.Y. Nov. 10, 2020) ("description of [plaintiff] as a cold individual who was indifferent to the health of others" was protected opinion); *O'Loughlin v. Patrolmen's Benev. Ass'n of City*

*of N.Y., Inc.*, 178 A.D.2d 117, 118 (1st Dep't 1991) (statement that plaintiff was "a 'disgrace to the entire police service'" was "indefinite and ambiguous" and could not "be characterized as true or false").

*Last Week Tonight*'s commentary on Morley's testimony is also protected opinion, including Oliver's remarks that "it doesn't get any better when you hear a doctor at AmeriHealth," Episode at 31:01-15, and, after playing audio of Morley's testimony, "when I first heard that, I thought that had to be taken out of context. There is no way a doctor, a licensed physician, would testify in a hearing that he thinks it's okay if people have shit on them for days," *id.* at 31:28-41. Again, these statements about Oliver's personal reaction to Morley's testimony are incapable of being proved true or false. *See, e.g.*, *Chau*, 771 F.3d at 129 (use of "I" statements "signals to readers that something is opinion, not fact"). To the extent they convey the factual assertion that Morley testified "he thinks it's ok if people have shit on them for days," that assertion is based on the disclosed facts about Morley's testimony, which are substantially accurate and absolutely privileged. *See supra* at 13-19; *Adelson v. Harris*, 973 F. Supp. 2d 467, 490 (S.D.N.Y. 2013) ("A simple expression of opinion based on disclosed nondefamatory facts is not itself sufficient for an action of defamation, no matter how unjustified and unreasonable the opinion may be or how derogatory it is." (cleaned up)), *aff'd*, 876 F.3d 413 (2d Cir. 2017). And Oliver's expressions of outrage about that testimony—"it made me want to punch a hole in the wall," Episode at 31:43-48, and "fuck that doctor with a rusty canoe, I hope he gets tetanus of the balls," *id.* at 32:20-25—are also classic opinion. *See, e.g.*, *Rosa v. Eaton*, 2024 WL 3161853, at *3 (S.D.N.Y. June 25, 2024) ("words like 'scum,' 'predators,' [and] 'greedy crooks' . . . are vague, imprecise statements of hyperbole considered nonactionable opinion"); *Moore v. Cohen*, 548 F. Supp. 3d 330, 348 (S.D.N.Y. 2021) (statements "using humor

to comment on" accusations against plaintiff, "rather than making independent factual assertions," were not actionable), *aff'd*, 2022 WL 2525722 (2d Cir. July 7, 2022).

Lastly, the Episode's description of McDonald as "a similar patient" to Facenda, Episode at 31:08-09, is protected opinion.  The word "similar" is "indefinite and ambiguous," lacking "a precise meaning which is readily understood."  *Steinhilber v. Alphonse*, 68 N.Y.2d 283, 292 (1986).  Although Morley might disagree about whether McDonald and Facenda are similar, the comparison is not "capable of being objectively characterized as true or false."  *Id.* at 293-94 ("statements that plaintiff lacked 'talent, ambition, and initiative'" would not be understood as factual); *see also, e.g.*, *Mirage Ent., Inc. v. FEG Entretenimientos S.A.*, 326 F. Supp. 3d 26, 37 (S.D.N.Y. 2018) (statement that recording artist's fans "deserve better" was not actionable because it had a "subjective, relative meaning" and could "mean different things to different people"); *Wheeler v. Twenty-First Century Fox*, 322 F. Supp. 3d 445, 457 (S.D.N.Y. 2018) (defendant's "assessment of what amount of information qualifies as 'much' is a 'subjective view'").

## IV.    <u>The Complaint Fails to Plausibly Plead Actual Malice, as Required in this Case.</u>

Morley fails to state a claim based on any of the challenged statements for one additional reason:  He does not allege any facts that could plausibly establish *Last Week Tonight* published the challenged statements and implications with actual malice.

Under New York's anti-SLAPP law, a plaintiff challenging speech on an "issue of public interest" must plausibly allege that the defendant published the challenged statements with actual malice, that is, "with knowledge of its falsity or with reckless disregard of whether it was false." N.Y. Civ. Rights Law § 76-a; *see also Bobulinski*, 758 F. Supp. 3d at 179.[6]  The actual malice

---

[6] This provision of the anti-SLAPP statute is substantive and therefore applies in federal court. *See Satanic Temple, Inc. v. Newsweek Mag. LLC*, 2025 WL 919423, at *8 (S.D.N.Y. Mar. 26,

standard considers whether the speaker had "subjective doubts about the truth of the publication." *Behar*, 238 F.3d at 174.  The standard serves the "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open," even if the debate "may well include vehement, caustic, and sometimes unpleasantly sharp," or even "erroneous," commentary.  *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270-71 (1964); *see also Bobulinski*, 758 F. Supp. 3d at 179 ("The actual malice standard is intentionally a high bar.").  Accordingly, courts routinely dismiss complaints that fail to "plead plausible grounds to infer actual malice by alleging enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of actual malice."  *Brimelow v. N.Y. Times Co.*, 2021 WL 4901969, at *1 (2d Cir. Oct. 21, 2021).

As a threshold matter, the challenged statements and implications undeniably relate to an issue of public interest: "the efficacy of the Medicaid system," including the role of MCOs.  Compl. ¶¶ 44-45.  This issue is of such public interest that, prior to this lawsuit, Morley's testimony in McDonald's case had attracted press coverage, and the Episode had received 3.5 million views on YouTube alone, as the Complaint concedes.  *Id.* ¶¶ 42, 107; *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 585 U.S. 878, 911 (2018) (speech on public spending and healthcare is "of great public concern"); *Bobulinski*, 758 F. Supp. 3d at 177-78 ("The New York legislature has directed courts to construe an issue of public interest broadly, meaning any

---

2025), *appeal filed*, No. 25-868 (2d Cir. Apr. 11, 2025); *Bobulinski*, 758 F. Supp. 3d at 179 n.7; *Kesner v. Buhl*, 590 F. Supp. 3d 680, 693 (S.D.N.Y. 2022); Matthew L. Schafer & Tanvi Valsangikar, *The Application of the New York Anti-SLAPP Scheme in Federal Court*, 2 J. Free Speech L. 573, 617-18 (2023).  In light of the anti-SLAPP law, the Court need not consider at this stage whether Morley must plead actual malice as a matter of constitutional law because he is a public official (given his role in overseeing and administering the expenditure of Medicaid funds) or a public figure (based on prior reporting about his role in the McDonald case).  *See Biro v. Conde Nast*, 807 F.3d 541, 542-44 (2d Cir. 2015).

subject other than a purely private matter." (cleaned up)). Thus, the actual malice standard

applies here. N.Y. Civ. Rights Law § 76-a(2).

Notably, the factual allegations in the Complaint undermine any contention of actual

malice. Compl. ¶¶ 103-09. ***First***, Morley's allegations about *Last Week Tonight*'s review of the

records from McDonald's proceedings against AmeriHealth demonstrate the opposite of actual

malice. Morley alleges, for example, that the show "knew and disregarded" that the challenged

statements were false because it "obtained and reviewed the entire" three-hour hearing from

McDonald's case, including Morley's lengthy testimony. Compl. ¶¶ 60-70. He also alleges the

show reviewed other relevant "public records" and the Iowa Auditor's Report. *Id.* ¶¶ 57 n.1, 85.

Far from evincing a knowing or reckless disregard for the truth, these allegations establish that

*Last Week Tonight* undertook careful, thorough research in preparing the Episode. *See, e.g.*,

*Behar*, 238 F.3d at 174 (no actual malice where defendant conducted "extensive research"); *Biro*,

963 F. Supp. 2d 255, 285 (S.D.N.Y. 2013) (no actual malice where challenged article "appears to

be the product of an enormous amount of careful and diligent research"), *aff'd*, 807 F.3d 541.

Furthermore, the records of McDonald's proceedings supported the show's understanding that

Morley testified "he thinks it's okay if people have shit on them for days." Episode at 31:37-41;

*see supra* at 4-5, 14-15. Tellingly, Oliver and the show's producers were not the only ones who

interpreted the testimony this way—even AmeriHealth's attorney understood Morley's

statements to convey that meaning. *See* Respondent's Br. at 20; Hearing at 2:59:13-32. But,

even if *Last Week Tonight* misinterpreted Morley's testimony (which it did not), that would not

be enough to show it doubted the truth of the statements about Morley. Longstanding Supreme

Court precedent holds that choosing "one of a number of possible rational interpretations of an

event that bristled with ambiguities" does not constitute actual malice. *Bose Corp. v. Consumers*

*Union of U.S., Inc.*, 466 U.S. 485, 512 (1984) (cleaned up)); *see also BYD Co. v. VICE Media LLC*, 531 F. Supp. 3d 810, 823 (S.D.N.Y. 2021) ("inaccuracy itself will not demonstrate 'actual malice'"), *aff'd*, 2022 WL 598973 (2d Cir. Mar. 1, 2022) (summary order); *Themed Rests., Inc. v. Zagat Surv., LLC*, 4 Misc. 3d 974, 979 n.4 (Sup. Ct. N.Y. Cnty. 2004) ("neither imprecise phrasing nor simple misinterpretation render a statement actionable"), *aff'd*, 21 A.D.3d 826 (1st Dep't 2005).

**Second**, Morley's allegations that *Last Week Tonight* did not interview him or McDonald before the Episode aired, and "ignored prior news coverage" of McDonald, do not show actual malice.  Compl. ¶¶ 89-90, 92, 107.  The Complaint acknowledges that a producer from the show contacted Morley for comment before the Episode aired.  *Id.* ¶ 58.  Morley chose not to comment and instead made the unusual demand that the producer set up an in-person meeting with McDonald—whom Morley had never met before cutting his care—so that he could "explain his testimony," *id.* ¶ 89, which the producer allegedly declined because "*Last Week Tonight* does not do that."  *Id.* ¶ 90.  Again, these allegations show the opposite of actual malice:  The show gave Morley an opportunity to present his side of the story to a producer, which he chose not to take.  *See Behar*, 238 F.3d at 174-75 (no actual malice in light of reporter's "extensive research," including unsuccessful efforts to interview plaintiff's representative); *MiMedx Grp., Inc. v. Sparrow Fund Mgmt. LP*, 2018 WL 847014, at *8 (S.D.N.Y. Jan. 12, 2018) (contacting plaintiff "shows precisely the opposite of malice"), *R&R adopted*, 2018 WL 4735717 (Sept. 29, 2018).  The Episode itself also reflects that *Last Week Tonight* did review news coverage of McDonald, *see* Episode at 29:55-57 (showing headline from *Des Moines Register* article about McDonald), which bolstered its understanding of Morley's testimony, but even if it had not undertaken that additional research, that would not be evidence of actual malice.  *See, e.g.*, *Hodges v. Lutwin*,

2023 WL 3362836, at *4 (2d Cir. May 11, 2023) (alleged "lack of an investigation or failure to

consider [plaintiffs'] side of the story" were insufficient "to survive a motion to dismiss").

>    **Third**, Morley's allegations that the show refused his October 2024 retraction demand are

insufficient.  Compl. ¶¶ 93-95.  A "failure to retract" does not show actual malice, since it

"occurs, by definition, after publication, meaning that its probative value as to a defendant's state

of mind at the time of publication is dubious at best."  *Biro*, 963 F. Supp. 2d at 281; *accord 1st

Amend. Praetorian*, 2025 WL 949575, at *10.  If anything, *Last Week Tonight*'s decision to send

Morley public records instead of retracting the Episode, Compl. ¶¶ 2, 57 n.1, 94, demonstrates

that it continued to believe the Episode was accurate.

>    Absent any factual allegations plausibly demonstrating actual malice, Morley's claim

should be dismissed for this independent reason.

## V.    <u>Oliver and PIP Are Entitled to Attorney's Fees and Costs.</u>

>    If they prevail on this motion to dismiss for any of the reasons set forth above, Oliver and

PIP should be awarded attorney's fees and costs pursuant to New York's anti-SLAPP statute.

The law, as amended in 2020, mandates that "costs and attorney's fees *shall* be recovered upon a

demonstration" that an action involving public petition and participation "was commenced or

continued without a substantial basis in fact and law."  N.Y. Civ. Rights Law § 70-a(1)(a)

(emphasis added).  An "action involving public petition and participation" is one arising from the

"exercise of the constitutional right of free speech in connection with an issue of public interest."

N.Y. Civ. Rights Law § 76-a(1)(a)(2).  This fee-shifting provision applies in federal court

diversity actions because "[e]ntitlement to attorney's fees is a substantive right under *Erie* [*R.R.

Co. v. Tompkins*, 304 U.S. 64 (1938)]," and does not conflict with any federal procedural rules.

*Bobulinski*, 758 F. Supp. 3d at 186; *see also, e.g.*, *Heilbut v. Cassava Scis., Inc.*, 2025 WL

919654, at *8-10 (S.D.N.Y. Mar. 26, 2025) (concluding that attorney's fees under Section 70-a

are recoverable in federal court); *Sparrow Fund Mgmt. LP v. MiMedx Grp., Inc.*, 2021 WL

12101061, at *6-7 (S.D.N.Y. Sept. 28, 2021) (same); *Goldman v. Reddington*, 2021 WL

4099462, at *5 (E.D.N.Y. Sept. 9, 2021) (same).  The provision awarding attorney's fees reflects

the New York legislature's substantive "policy decision that mandatory fee-shifting applies to

the subset of cases defined as SLAPP suits where the claim lacks a 'substantial basis'"—

including cases where the defendant prevails on a motion to dismiss.  *Bobulinski*, 758 F. Supp.

3d at 184-86; *see also Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 259 n.31

(1975) (in diversity cases, "state law denying the right to attorney's fees or giving a right thereto,

which reflects a substantial policy of the state, should be followed"); *Cotton v. Slone*, 4 F.3d 176,

180 (2d Cir. 1993) ("Attorney's fees mandated by state statute are available when a federal court

sits in diversity."); *Adelson v. Harris*, 774 F.3d 803, 809 (2d Cir. 2014) (finding Nevada anti-

SLAPP statute's fee provision substantive and therefore applicable in federal court); Schafer &

Valsangikar, 2 J. Free Speech L. at 599-614.  The legislature's policy decision to make

mandatory fee-shifting "the principal remedy currently provided to victims of SLAPP suits in

New York" was rooted in its awareness that fee awards "protect citizens by encouraging only

meritorious litigation" and deterring costly, speech-chilling suits.  S52A Sponsor Mem. (July 22,

2020), https://www.nysenate.gov/legislation/bills/2019/S52.  Further, applying the fee-shifting

provision in federal court serves the *Erie* doctrine's "twin aims" of "furthering equitable

administration of laws and preventing forum shopping" by not depriving defendants in federal-

court SLAPP suits of the law's core remedy.  *Bobulinski*, 758 F. Supp. 3d at 186.

    Because this case is an action involving public petition and participation and Morley has

failed to state a claim, Oliver and PIP request an opportunity to seek their attorney's fees if this

motion is granted.  *See id.* at 190 (permitting defendants to submit a "request for attorney's fees

and costs with appropriate documentation"); *see also Bobulinski v. Tarlov*, 2025 WL 872178

(S.D.N.Y. Mar. 20, 2025) (awarding fees).

## CONCLUSION

For each of the foregoing independent reasons, Oliver and PIP respectfully request that

this Court dismiss the Complaint in its entirety with prejudice, grant them the opportunity to seek

attorney's fees, and grant such other relief as this Court deems proper.

Dated: May 30, 2025                    Respectfully submitted,

                                       BALLARD SPAHR LLP

                                       By:    */s/ Michael Berry*
                                              Michael Berry
                                              Elizabeth Seidlin-Bernstein
                                              1735 Market Street, 51st Floor
                                              Philadelphia, PA 19103
                                              Tel: (215) 665-8500
                                              Fax: (215) 864-8999
                                              berrym@ballardspahr.com
                                              seidline@ballardspahr.com

                                              Sasha Dudding (application pending)
                                              1675 Broadway, 19th Floor
                                              New York, NY 10019
                                              Tel: (212) 223-0200
                                              Fax: (212) 223-1942
                                              duddings@ballardspahr.com

                                              *Attorneys for Defendants John Oliver and Partially*
                                              *Important Productions, LLC*

**WORD COUNT CERTIFICATION**

I, Michael Berry, hereby certify that this Memorandum contains 8,748 words and is in compliance with Local Rule 7.1.  In preparing this certification, I relied on the word count of the word-processing system used to prepare this document.


Dated: May 30, 2025                                  */s/ Michael Berry*
                                                     Michael Berry