UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

BRIAN MORLEY,

                     Plaintiff,

                 v.

JOHN OLIVER and PARTIALLY IMPORTANT
PRODUCTIONS, LLC,

                  Defendants.

25-CV-2563 (RA)

<u>OPINION & ORDER</u>

RONNIE ABRAMS, United States District Judge:

This case involves comedian John Oliver's April 2024 coverage of state-run Medicaid programs during his weekly television show, *Last Week Tonight*.  Plaintiff Brian Morley is a doctor who worked for AmeriHealth Caritas ("AmeriHealth"), the Managed Care Organization ("MCO") entrusted with managing Iowa's privatized Medicaid program.  Morley brings this lawsuit against Oliver and his production company, Partially Important Productions, LLC (collectively "Defendants"), claiming that during a portion of the episode critical of Iowa's Medicaid privatization, Defendants defamed him.  Defendants move to dismiss the lawsuit, arguing that the episode was not defamatory.  They also seek attorneys' fees under New York's anti-SLAPP law.

During the show, Oliver discussed certain cost-cutting measures, including the cancellation of nursing services, such as bathing and diaper-changing, for Louis Facenda, a young man with cerebral palsy.  After describing that as "obviously maddening," Oliver continued: "And it doesn't get any better when you hear a doctor at AmeriHealth, the MCO that took over in Iowa, explaining in a hearing about a similar patient, just what the corporate thinking was about the necessity of keeping people clean."  Oliver then played an edited clip of Morley's testimony from a hearing

involving the reduction of services for another individual with cerebral palsy, in which Morley stated: "People have bowel movements every day where they don't completely clean themselves. . . . People are allowed to be dirty. . . . You know, I would allow him to be a little dirty for a couple of days." In expressing outrage at Morley's testimony, Oliver characterized him as "think[ing] it's okay if people have shit on them for days."

Morley does not dispute that the clip Oliver played was indeed from his testimony. He instead alleges that by likening Facenda to the patient about whom he was testifying and by excerpting portions of the testimony—and through the show's juxtaposition of video, audio, and Oliver's words—Defendants defamed Morley by suggesting that he (1) illegally denied Facenda and/or the "similar" patient Medicaid services and (2) testified that patients in diapers or who cannot bathe themselves can be left in their own fecal matter for days.

In their motion to dismiss, Defendants argue that the show was fundamentally accurate, and that Oliver's statements were protected opinions, not of and concerning Morley, and/or protected by the fair report privilege. For the reasons that follow, the Court agrees and dismisses the Complaint. Defendants' motion for fees, however, is denied.

## BACKGROUND

The following allegations, except where otherwise noted, are taken from the Complaint, integral or incorporated documents, and those documents of which the Court takes judicial notice.[1]

---

[1] As part of their motion, Defendants submit several exhibits that they argue are either incorporated into or integral to the Complaint, or for which they suggest judicial notice is appropriate. The episode in question is incorporated into the Complaint, as courts in this Circuit routinely review video incorporated by reference in deciding a motion to dismiss when heavily relied upon in a complaint. *See Stepanian v. City of New York*, 2015 WL 5350801, at *3 (E.D.N.Y. Sept. 14, 2015) (collecting cases). The parties agree that the Court may take judicial notice of Exhibit B, the report of the Iowa State Auditor, to assess Defendants' fair report defense. Dkt. No. 30 (Pl.'s Opp'n) at 11; Dkt. No. 31 (Defs.' Repl. Br.) at 10; *see also Brown v. New York City Transit Auth.*, 2024 WL 1347283, at *6 (S.D.N.Y. Mar. 29, 2024) (taking judicial notice of inspector-general report issued by state agency). They further agree that in assessing Defendants' fair report defense, the Court may also take judicial notice of Exhibits C through E: the hearing, ALJ proposed decision, and Iowa Department of Human Services decision from the proceedings relating to the "similar patient" about whom Morley testified. Pl.'s Opp'n at 11; Defs.' Repl. Br. at 10.

The Court assumes the contents of the Complaint to be true, except for where they "are contradicted . . . by documents upon which [Morley's] pleadings rely, or by facts of which the court may take judicial notice." *In re Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d 371, 405–06 (S.D.N.Y. 2001).

Defendants John Oliver and Partially Important Productions, LLC, produce *Last Week Tonight with John Oliver*, a weekly television program broadcast on the HBO Max platform and published on YouTube. Dkt. No. 1 (Compl.) ¶¶ 12–14. Oliver, Morley alleges, has a reputation for mixing "meticulous[] research[]" and "hard[-]hitting journalism" with "laughs." *Id.* ¶ 14. Millions of viewers watch the show weekly. *Id.*

On April 14, 2024, Defendants aired a show focused on Medicaid. *Id.* ¶ 41; Dkt. No. 23-1 (Defs.' Mot., Ex. A (the "Episode")).[2] The Episode highlights various flaws with the Medicaid system, including policy failures that lead Medicaid patients to lose their coverage. Episode at 0:00–27:26; Compl. ¶ 44. Approximately 27 minutes into the Episode, Oliver begins a roughly five-minute segment on MCOs and Medicaid privatization, explaining to viewers the profit

---

Morley is contesting whether the Court may take notice of other documents from a lawsuit that the "similar patient" brought to challenge AmeriHealth's denial of services, Exhibits F through J. He suggests that they are "irrelevant, not incorporated by the Complaint, and not 'integral' to Morley's claims." Pl.'s Opp'n at 12. These documents, however, are relevant to assessing the fair report defense for the same reason as Exhibits C through E, as they relate to that same proceeding. They are also judicially noticeable. *Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006) (taking notice of public documents part of a judicial proceeding).

Defendants also submit Exhibits K through M: news reports which they argue are incorporated by reference into the Complaint. The Court disagrees. Although the Complaint references unidentified news reports, a pleading's mere mention of unidentified news coverage does not incorporate specific reports by reference, and courts do not typically take judicial notice of such reports. *Nunes v. NBCUniversal Media, LLC*, 643 F. Supp. 3d 403, 420 (S.D.N.Y. 2022) (reporting "not cited or referenced in the Complaint" not reviewable upon motion to dismiss); *cf. In re Sterling Foster & Co., Inc., Sec. Litig.*, 222 F. Supp. 2d 216, 251 (E.D.N.Y. 2002) ("As a sidelight, the Court notes that it can rely on the news articles *mentioned and quoted in the complaint* in determining the present motions to dismiss because they are incorporated in the complaint by reference.") (emphasis added).

[2] The Episode is available on YouTube at https://www.youtube.com/watch?v=bVIsnOfNfCo. The YouTube version of the Episode is slightly shorter than the version of the Episode at Exhibit A. The Court uses the time stamps from Exhibit A throughout this opinion.

motives of MCOs and mentioning problems that have arisen with MCOs in "state after state." Episode at 27:26–29:57.

As part of that five-minute segment, the Episode next turns to Iowa and its 2016 decision to use an MCO to run its Medicaid program. After describing—based on a report from the Iowa State Auditor—a "nearly 900% increase in members being illegally denied services or care" after AmeriHealth took over Iowa's Medicaid program, Oliver introduces a video of Louis Facenda, an Iowan with cerebral palsy and significant mobility issues, who Morley describes as "harnessed in a wheelchair." Compl. ¶ 50. Facenda, the video clip explains, lost medication coverage and "daily nurse visits," including "in-home bathing and diaper changing," once the MCO got involved. *Id.* ¶ 48(d) (emphasis omitted). Oliver continues: "Look that's obviously maddening. And it doesn't get any better when you hear a doctor at AmeriHealth, the CMO [sic] that took over in Iowa, explaining in a hearing about a similar patient, just what the corporate thinking was about the necessity of keeping people clean." *Id.* ¶ 48(e) (emphases omitted). Oliver then plays and displays the following excerpt of testimony from Morley, a medical doctor and hospital administrator who served as AmeriHealth's medical director, *id.* ¶ 11, at a 2017 Medicaid coverage hearing:



Episode at 31:27. The parties agree that the "similar patient" whom the 2017 hearing concerned is Nathan McDonald, another Iowan with cerebral palsy.[3] Oliver next says:

> Look, I'll be honest, when I first heard that, I thought that had to be taken out of context. There is no way a doctor, a licensed physician, would testify in a hearing that he thinks it's okay if people have shit on them for days. So, we got the full hearing, and I'm not gonna play it for you, I'm just gonna tell you: he said it, he meant it, and it made me want to punch a hole in the wall.

Compl. ¶ 48(h) (emphases omitted).

After Oliver plays the reactions of Facenda and his mother to Morley's testimony, Oliver continues his criticism of Morley, then saying: "Fuck that doctor with a rusty canoe," *id.* ¶¶ 1, 48(f), and "People are allowed to be a little dirty sometimes, apparently that's doctor's fucking orders." Episode at 31:43–32:25. Oliver concludes his discussion of Facenda by disclosing that "while, legally, I have to tell you, AmeriHealth eventually restored Louis's service, it is a disgrace it was even a fight to begin with." Compl. ¶ 48(j).

*\*\*\**

On March 27, 2025, Morley filed this action, alleging that Defendants defamed him in the Episode by conveying the "False and Defamatory Meanings . . . that (1) Dr. Morley illegally denied care to Louis [Facenda] and/or the alleged 'similar' Actual Patient [(McDonald)] and (2) Dr. Morley testified that it is 'okay' for individuals who wear diapers and/or cannot bathe themselves 'to have shit on them for days' and to otherwise be left sitting in their own bowel movements for days." Compl. ¶ 100. Defendants then filed the instant motion to dismiss, arguing, *inter alia*, that both Oliver's statements and the segment's broader implications were substantially accurate, non-actionable opinions, not of and concerning Morley, and/or protected under New York's fair report

---

[3] As noted above, the Court takes judicial notice of McDonald's hearing and related proceedings.

privilege.    Dkts. No. 21 (Defs.' Mot.), 22 (Defs.' Br.).    Defendants also make a motion for attorneys' fees under New York's anti-SLAPP statute, New York Civil Rights Law § 70-a.

## LEGAL STANDARD

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  In assessing a complaint, the Court must accept "all factual allegations as true, but giv[e] no effect to legal conclusions couched as factual allegations." *Stadnick v. Vivint Solar, Inc.*, 861 F.3d 31, 35 (2d Cir. 2017).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Claims merely "consistent" with liability are insufficient, *Twombly*, 550 U.S. at 570, and the "factual allegations must be enough to raise a right to relief above the speculative level," *id.* at 555.  Where a state law claim is filed in federal court, a court must apply state substantive law and federal procedural law. *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 426–28 (1996).  "New York substantive law applies to this defamation action," because "[w]hen a federal court sits in diversity, it applies the choice of law rules of the forum state, here New York." *Chau v. Lewis ("Chau II")*, 771 F.3d 118, 126 (2d Cir. 2014).  There is no dispute between the parties that these choice of law rules dictate the application of New York substantive law.

"To state a claim for defamation under New York law, a plaintiff must adequately allege: (1) a defamatory statement, (2) published to a third party, (3) made with the applicable level of fault, (4) causing special damages or qualifying as defamation per se." *Bobulinski v. Tarlov*, 758 F. Supp. 3d 166, 173 (S.D.N.Y. 2024), *appeal withdrawn*, 2025 WL 1009663 (2d Cir. Mar. 31, 2025).  "The New York Court of Appeals has defined 'defamation' as 'a false statement that tends

to expose a person to public contempt, hatred, ridicule, aversion or disgrace.'" *Id.* (quoting *Davis v. Boeheim*, 24 N.Y.3d 262, 269 (2014)); *see also Tannerite Sports, LLC v. NBCUniversal News Grp.*, 864 F.3d 236, 247 (2d Cir. 2017) (describing "lack of substantial truth" as "an element of a New York defamation claim").

There are numerous arguments available to a defendant in a defamation case in New York, certain of which Defendants raise here.  First, to state a claim for defamation, the allegedly defamatory statement must be "of and concerning" the plaintiff:

> The "of and concerning" requirement significantly limits the class of plaintiffs who may sue for communications they believe to be false, defamatory, and injurious. Plaintiffs in defamation proceedings bear the burden of demonstrating that the libel designates the plaintiff in such a way as to let those who knew her understand that she was the person meant.  The Court properly may dismiss an action pursuant to Rule 12(b)(6) where the statements are incapable of supporting a jury's finding that the allegedly libelous statements refer to plaintiff.

*Thai v. Cayre Grp., Ltd.*, 726 F. Supp. 2d 323, 329–30 (S.D.N.Y. 2010).  "Whether a challenged statement reasonably can be understood as of and concerning the plaintiff is a question of law for the Court, which 'should ordinarily be resolved at the pleading stage.'"  *Gilman v. Spitzer*, 902 F. Supp. 2d 389, 394 (S.D.N.Y. 2012), *aff'd*, 538 F. App'x 45 (2d Cir. 2013) (quoting *Church of Scientology Int'l v. Behar*, 238 F.3d 168, 173 (2d Cir. 2001)).

A defamatory statement must also be an assertion of fact, rather than opinion:

> Under New York law, . . . expressions of opinion, as opposed to assertions of fact, are deemed privileged and, no matter how offensive, cannot be the subject of an action for defamation. . . . [D]istinguishing between fact and opinion is a question of law for the courts, to be decided based on what the average person hearing or reading the communication would take it to mean . . . [T]he factors to be considered by the court . . . are: (1) whether the specific language in issue has a precise meaning which is readily understood; (2) whether the statements are capable of being proved true or false; and (3) whether either the full context of the communication in which the statement appears or the broader social context and surrounding circumstances are such as to signal readers or listeners that what is being read or heard is likely to be opinion, not fact.

*Sheindlin v. Brady*, 597 F. Supp. 3d 607, 625 (S.D.N.Y. 2022).

Under New York law, moreover, "truth is an absolute, unqualified defense to a civil defamation action and . . . substantial truth is all that is required" to defeat a defamation claim. *Enigma Software Grp. USA, LLC v. Bleeping Computer LLC*, 194 F. Supp. 3d 263, 281 (S.D.N.Y. 2016). "Whether a statement is substantially true is an issue of law properly decided on a motion to dismiss, provided that the Court limits its consideration to materials appropriately considered on such a motion." *Nunes v. NBCUniversal Media, LLC*, 643 F. Supp. 3d 403, 413 (S.D.N.Y. 2022) (citing *Tannerite Sports*, 864 F.3d at 247).

Lastly, as relevant here, under New York Civil Rights Law § 74, "[a] civil action cannot be maintained against any person . . . or corporation, for the publication of a fair and true report of any judicial proceeding, legislative proceeding or other official proceeding . . . which is a fair and true headnote of the statement published." The Second Circuit has explained how this rule, referred to as the fair report privilege, applies at the motion to dismiss stage:

> A statement comes within the privilege and is deemed a fair and true report if it is substantially accurate, that is if, despite minor inaccuracies, it does not produce a different effect on a reader than would a report containing the precise truth. . . . New York courts adopt a liberal interpretation of the fair and true report standard of Section 74 so as to provide broad protection to news accounts of judicial proceedings. In other words, New York courts will not review the challenged language . . . with a lexicographer's precision.

*Kinsey v. New York Times Co.*, 991 F.3d 171, 178–79 (2d Cir. 2021).

## DISCUSSION

Morley identifies nine defamatory statements in the Complaint, *see* Compl. ¶ 48, which he argues individually and collectively conveyed the defamatory message "that (1) Morley illegally denied care to [Facenda] and/or [McDonald] and (2) Morley testified that it is 'okay' for individuals who wear diapers and/or cannot bathe themselves 'to have shit on them for days' and

8

to otherwise be left sitting in their own bowel movements for days." *Id.* ¶ 100. Defendants argue that these statements—and the broadcast as a whole—are protected by the fair report privilege, non-actionable opinions, or are not of and concerning Morley.[4] The Court begins by analyzing Oliver's discrete statements, before determining the implied meaning of the entire segment and Episode. Ultimately, the Court finds Defendants' view persuasive: whether examining Oliver's individual statements or the implication of the segment, the Episode is not defamatory.

## I. Morley Has Not Stated a Claim for Direct or Express Defamation

Morley identifies nine statements that he claims are defamatory, Compl. ¶ 48; Oral Argument Tr. at 11:15, none of which are actionable under a direct or express defamation theory. "Insofar as [Morley's C]omplaint is premised on express defamation, it must be dismissed," as his claims are based on substantially accurate statements "that are not reasonably susceptible of defamatory connotations" and thus covered by the fair report privilege, *Stepanov v. Dow Jones & Co.*, 120 A.D.3d 28, 34 (1st Dep't 2014), not of and concerning Morley, protected opinions, and/or substantially true.

### A. The Law of Direct or Express Defamation

"Express-defamation claims—unlike defamation-by-implication claims—concern direct statements . . . about allegedly false statements of verifiable fact." *Wang v. Sussman*, 2025 WL 8135, at \*5 (S.D.N.Y. Jan. 13, 2025). The Court must construe all "allegedly defamatory words . . . in the context of the publication as a whole, . . . in the same way that the . . . [viewing] public, acquainted with the parties and the subject would take them." *Chau II*, 771 F.3d at 126. In considering a claim for defamation involving a television show, "words must be construed in the entire context of the program," including the "audio and video mosaic," and "tested against the

---

[4] Defendants also argue that Morley has not sufficiently alleged actual malice, but the Court need not reach this issue.

understanding of the average viewer." *Lasky v. Am. Broad. Co., Inc.*, 631 F. Supp. 962, 968 (S.D.N.Y. 1986).

**B.  None of the Direct or Express Statements in the Segment are Defamatory**

Morley first identifies the following statement from Oliver—made before he even mentions Morley—describing the incentives of MCOs in the "for profit healthcare system":

> Look, financial damage is one thing. But the most infuriating thing about MCOs is that, as with so many players in our for-profit healthcare system, they are incentivized to cut costs at the expense of necessary care.  Because MCOs get paid a set monthly amount per person, meaning they get a fixed rate, so their profit is whatever they don't spend on patients. And you can probably see where this is going.

Compl. ¶ 48(a) (emphases omitted); Episode at 29:21–45.  Morley argues that because he is an employee of the sole MCO identified in the segment, the statement is of and concerning him.  The Court disagrees.  The statement instead represents Oliver's view of the motivation of MCOs generally.  It is true that Oliver later homes in on Morley, but Oliver makes this particular statement just after discussing coverage on the Consumer News and Business Channel ("CNBC") of a wholly different MCO, Centene, and its former chief executive officer.  *Id.* at 27:30–29:21.  Indeed, Oliver had previously mentioned the CEO of Centene by name, and had played television coverage of Centene's profit margins.  Following that statement—and before getting into coverage of Iowa's MCO or Morley—Oliver references the MCOs in numerous other states.  *Id.* at 29:30–30:30.  As other courts have made clear, mention of an individual in one portion of a publication "does not mean that all of the statements concern Plaintiff," which is "even true when the plaintiff is described as part of this larger group or an example of a member of the group."  *1st Amend. Praetorian v. N.Y. Times Co.*, 2025 WL 949575, at *14 (S.D.N.Y. Mar. 28, 2025) (collecting cases); *Chau v. Lewis ("Chau I")*, 935 F. Supp. 2d 644, 664 (S.D.N.Y. 2013), *aff'd*, 771 F.3d 118 (2d Cir. 2014) (holding that "every unflattering comment" made about CDO managers in defendant

10

Michael Lewis's book, *The Big Short*, were not of and concerning plaintiff simply because plaintiff is a CDO manager who "appear[ed] as a central representative character" in one chapter). Furthermore, Morley never alleges how this statement is false, nor why it is anything more than Oliver's opinion of how and why the broader Medicaid system operates as it does.

The next statement Morley identifies as defamatory is Oliver's statement that:

> In state after state, there've been heartbreaking stories of MCO's [sic] denying care and *prioritizing cost cutting over patients*.

Compl. ¶ 48(b) (emphasis in original); Episode at 29:45-30:53. Morley argues that this statement is of and concerning him because the Facenda story, which follows shortly thereafter, is the only example of such a "heartbreaking" story featured in the segment. Even if he is right about that, the statement still is not defamatory because it constitutes an opinion. In it, Oliver characterizes the stories of care denial as "heartbreaking." Compl. ¶ 48(b). Thus, to the extent that the "cost cutting" portion of this statement refers to AmeriHealth's denial of care for McDonald, and is therefore of and concerning Morley, it can still only reasonably be seen to be an assertion of Oliver's opinion that MCOs unfairly prioritize cost cutting over patient wellbeing. This statement is not defamatory, as "speculat[ing] about motivations" and "imputing a motive or state of mind to a person based on that person's publicly reported conduct is not actionable in defamation." *Cummings v. City of New York*, 2020 WL 882335, at *22 (S.D.N.Y. Feb. 24, 2020). Doing so is, instead, a statement of opinion. *Id.* Nonetheless, although the statement itself is not defamatory, it is still relevant context for Oliver's non-opinion statements of and concerning Morley, the analysis of which follows.

Next, after Oliver notes that there have been headlines about MCOs denying care in various states, including Florida, New Jersey, and Iowa, he continues:

And just to focus on Iowa, it transitioned to using MCOs to run its Medicaid program in 2016, and in just its first three years, there was a nearly 900% increase in members being illegally denied services or care and some of the cost cutting was absolutely enraging. Like what happened with Louis Facenda, who has cerebral palsy and was living with his mother. He needs a lot of care, which prior to the switch over, was provided by Medicaid. But once an MCO got involved, he lost a lot of what he'd been getting, starting with his medications.



Compl. ¶ 48(c) (emphases omitted); Episode at 29:56–30:28. Oliver's statement regarding the "nearly 900% increase" in illegal denials is protected by the fair report privilege, because it is an accurate report of the contents of the Iowa State Auditor's Report, the official summary of which was prominently displayed. "New York courts have broadly construed the meaning of an official proceeding as used in Section 74" to include "a fair and accurate report of . . . [a government] investigation." *Test Masters Educ. Servs., Inc. v. NYP Holdings, Inc.*, 603 F. Supp. 2d 584, 588 (S.D.N.Y. 2009). The report described an "891% increase" in ALJs reversing "illegal[] deni[als]" of services by Iowa MCOs—in other words, "nearly 900%"—after AmeriHealth began administering Iowa's Medicaid program. Oliver's statement is therefore a fair and accurate summary of a finding from the Iowa State Auditor's Report. Morley, moreover, does not dispute that Facenda indeed did lose coverage for medicine or nursing services, so the opinion was not predicated on false facts. *Cf. DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 114 (2d Cir.

2010) (opinion still actionable if "based on false facts").  Oliver's reference to "cost cutting" being "absolutely enraging" is a protected opinion, because it reflects his reaction to the denial of care to Facenda.  Finally, this discrete statement is not of and concerning Morley: Oliver ascribed responsibility for Facenda's loss of care to AmeriHealth, not to Morley personally.

Oliver's next purportedly defamatory statement comes in response to video of Facenda's mother discussing his loss of medication coverage and loss of "daily nurse visits," which led Facenda to go "six weeks . . . without the in-home bathing and diaper changing he'd had for years." He states:

> Look that's . . . obviously maddening. And it doesn't get any better when you hear a doctor at AmeriHealth, the CMO [sic] that took over in Iowa, explaining in a hearing about a *similar patient*, just what the corporate thinking was about the necessity of keeping people clean.

Compl. ¶ 48(e) (emphasis in original); Episode at 31:01–31:15.  This statement is indisputably of and concerning Morley, as it references a doctor at AmeriHealth, and Oliver subsequently plays Morley's testimony.  Morley argues that its defamatory meaning comes from its connection to other statements in the segment.

Oliver next plays an edited recording of Morley's testimony during Nathan McDonald's hearing, the individual Oliver had just described as a "similar patient," Compl. ¶ 48(f), while simultaneously displaying the text of the testimony on-screen:



Episode at 31:27.

McDonald, another Iowan with cerebral palsy and significant mobility issues, received in-home treatment from a home health aide service beginning in 2012. According to the hearing testimony of his nurse, "Mrs. R," McDonald had significant physical limitations. Among other things, she testified that McDonald had to crawl around his apartment and used a wheelchair or walker when outside of it, could not "wash everywhere," "can't grasp the soap or the washcloth," and "when he does use the restroom, he is not able to wipe himself and become clean." Dkt. No. 23-3 (McDonald Hr'g) at 1:38:34–54. Up until AmeriHealth reduced his coverage, McDonald "received an average of two home health aide visits per day" to help manage his care. Dkt. No. 21-5 ("Proposed ALJ Decision" or "ALJ Decision") at 3, 7. Unlike Facenda, however, he did not require diaper changing. *Id.*

Morley suggests that Oliver's statement about a "similar patient," Compl. ¶ 48(e) (emphasis omitted), and the excerpting of his testimony, *id.* ¶ 48(f), are defamatory because they together convey the meaning that he did indeed deny care to Facenda and/or the similar patient.

He further argues that Oliver misled viewers by describing Facenda and McDonald as "similar," in particular, by leading viewers to believe that Morley's testimony "was about an incontinent man in diapers incapable of bathing himself." Dkt. No. 30 (Pl.'s Opp'n) at 22.

The Court disagrees, as it finds that the statement that Facenda and McDonald were "similar" is substantially accurate and protected by the fair report privilege. McDonald, like Facenda, is an Iowan with cerebral palsy and significant mobility issues. McDonald's nurse, who, unlike Morley, treated McDonald herself, testified that he was unable to bathe without assistance, could not grasp soap or a washcloth, and was "not able to wipe himself and become clean" after using the bathroom. In arguing that it is not substantially accurate to say that McDonald and Facenda were similar, Morley relies on the fact Facenda required diaper changing services while McDonald did not. Pl.'s Opp'n at 5–6. The Court rejects Morley's attempt to parse this distinction between these two individuals: Oliver never says that Morley's testimony concerned someone wearing diapers. More broadly, the Court agrees with Defendants that Facenda and McDonald— two men with cerebral palsy who were unable to fully clean themselves after a bowel movement— were "similar," even if their circumstances were not identical. In any case, the fair report privilege does not require that statements be "dead-on accurate." *Bauer v. Baud*, 2023 WL 2307413, at \*6 (S.D.N.Y. Mar. 1, 2023) (applying the fair report privilege when a publisher incorrectly reported that an individual had a "skull fracture" rather than "significant head . . . trauma").

Morley also argues that the fair report privilege is not applicable because Oliver's statement that McDonald was similar to Facenda constitutes Oliver's "analysis and commentary," rather than a report of the proceeding itself. Pl.'s Opp'n at 17 (quoting *Easton v. Pub. Citizens, Inc.*, 1991 WL 280688 (S.D.N.Y. Dec. 26, 1991)). Analysis that does not use the words of a judicial proceeding verbatim is, however, still protected by the privilege so long as "it fairly characterizes some aspect

of a judicial proceeding," *Karp v. Hill & Knowlton, Inc.*, 631 F. Supp. 360, 364 (S.D.N.Y. 1986), and "focus[es on] a judicial proceeding" itself. *Cf. Carroll v. Trump*, 664 F. Supp. 3d 550, 559 (S.D.N.Y. 2023) (privilege does not extend to report of "underlying events" leading to a judicial proceeding, but does apply to report on the "judicial proceeding" itself.). It is substantially accurate to say, based on a review of McDonald's hearing transcript, that Facenda and McDonald were indeed "similar patients." That statement—as with Oliver's other statements concerning Morley's testimony—is a conclusion that can be drawn by comparing Facenda's condition to that described in the McDonald hearing, without turning to "additional facts [concerning McDonald] not established in the [McDonald] proceeding." *Easton*, 1991 WL 280688, at *3. It is thus protected by the fair report privilege. *See id.*

Morley further argues that the audio of his testimony and the on-screen transcript omit the following key portions of his testimony, changing the meaning of his words in a defamatory manner:

> *In certain cases, yes, with a patient with significant comorbidities, you would want to have someone wiping them and getting the feces off. But like I said*, people have bowel movements every day where they don't completely clean themselves and we don't fuss over too much. People are allowed to be dirty. *It's when the dirty and the feces and the urine interfere with, you know, medical safety, like in someone who has concomitant comorbidities that you worry, but not in this specific case.* You know, I would allow him to be a little dirty for a couple days.

Compl. ¶ 79 (omitted portions emphasized). There is no dispute that the recording played during the segment omitted Morley's description of circumstances when he thought it would not be acceptable for fecal matter to remain on a patient "for a couple of days," namely when medical safety was at issue. "As the New York Court of Appeals has explained," however, "a fair and true report admits of some liberality; the exact words of every proceeding need not be given if the substance be substantially stated." *Biro v. Condé Nast*, 883 F. Supp. 2d 441, 477 (S.D.N.Y. 2012).

Morley argues that by omitting that portion of his testimony, the broadcast "distort[ed]" its meaning. Pl.'s Opp'n at 20; *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 517 (1991) ("[A]n exact quotation out of context can distort meaning," even when "the speaker did use each reported word."). But under the fair report privilege, "focus[ing] on only one aspect" of a judicial proceeding is protected speech under New York law so long as the report itself is "substantially accurate." *Tenney v. Press-Republican,* 75 A.D.3d 868, 869 (3d Dep't 2010). The edits to the transcript did not change the meaning of Morley's statement that he would allow McDonald to "be a little dirty for a couple of days," which remains a fair report of Morley's testimony. *See Friedman v. Bloomberg L.P.*, 884 F.3d 83, 93–94 (2d Cir. 2017) (holding that a statement is "deemed a fair and true report . . . if, despite minor inaccuracies, it does not produce a different effect on a reader than would a report containing the precise truth."). Notably, Morley never alleges that Facenda or McDonald had the "concomitant comorbidities" that Oliver omits from Morley's testimony.

> Reacting to the Morley quote, Oliver next says:
>
> Look, I'll be honest, when I first heard that, *I thought that had to be taken out of contex*t. There is no way a doctor, a licensed physician, would testify in a hearing that *he thinks it's okay if people have shit on them for days*. *So, we got the full hearing*, and I'm not gonna play it for you, I'm just gonna tell you: he said it, he meant it, and it made me want to punch a hole in the wall.

Compl. ¶ 48(h) (emphasis in original). The portion of this statement relating to Morley's belief that "it's okay if people have shit on them for days" is a fair retelling of Morley's testimony, because he did indeed testify that "[p]eople are allowed to be dirty" "for a couple of days"—in other words, to have feces on them for more than one day.

Morley pushes back, arguing that unlike Facenda, McDonald was not in diapers and that Morley did indeed approve nursing visits for him. But when McDonald sought pre-authorization for 120 home health visits over a two-month period, with two visits per day, Compl. ¶ 62; ALJ

Decision at 4, Morley and AmeriHealth denied the request in part, pre-authorizing McDonald for only fifty home health visits over that same period.  Compl. ¶ 63; ALJ Decision at 4–5.  As a result, there would be a period of more than 24 hours each week in which McDonald would not have any nursing visits and be left unclean.  Oliver's statement that Morley testified that it was "okay if people have shit on them for days" is thus both a fair report of Morley's testimony—"and substantially true." *Tannerite Sports*, 864 F.3d at 247.

Moreover, Oliver's expression of disbelief at Morley's testimony, the suggestion that Morley "meant it" and Oliver's statement that "it made me want to punch a hole in the wall," are statements of opinion.  Morley argues that these statements are grounded in misstatements of fact.  But as discussed above, he *did* testify that "[p]eople are allowed to be dirty," and that he "would allow [McDonald] to be a little dirty for a couple of days."  And while he also testified that in certain circumstances, people with certain "concomitant comorbidities" should not be left with feces on them for health-related reasons, there is no allegation that either McDonald or Facenda had such "concomitant comorbidities."  Thus, the factual assumption underlying Oliver's opinion is indeed substantially true. *See Frascatore v. Blake*, 344 F. Supp. 3d 481, 494 (S.D.N.Y. 2018) ("A statement of opinion that is accompanied by a recitation of the facts on which it is based or one that does not imply the existence of undisclosed underlying facts is protected as a statement of opinion and thus not a false statement of fact.").

The Complaint next alleges that Oliver's playing of Facenda's mother's response to Morley's testimony was also defamatory:

> Oliver: "And just watch what happens when Louis [Facenda] and his mom were told about what that doctor just said."

> Facenda's mother: "I would spit in his face, to be honest. Yeah, right Louis, you like to be clean. I think it's horrible. I don't have words for that."

Compl. ¶ 48(i).  Morley maintains that the juxtaposition of this statement and Morley's testimony is defamatory because it conveys that Morley was "discussing either [Facenda] or a *similar* patient." *Id.*  Yet, for the reasons discussed above, Morley's testimony did involve a patient "similar" to Facenda.

> In the last allegedly defamatory statement Oliver made in this segment, he said:

> And while, legally, I have to tell you, AmeriHealth eventually restored [Facenda's] service, it is a disgrace it was even a fight to begin with.

Compl. ¶ 48(j).  Morley contends that this statement was "intended . . . to convey that Morley illegally denied care to Facenda and/or [McDonald]," and more broadly that "[Morley] testified 'it's okay for people to have shit on them for days,' which clearly included individuals in diapers and/or who cannot bathe themselves after bowel movements."  Pl.'s Opp'n at 5.  But again, Oliver was clear that Morley's testimony concerned a "similar" patient, not Facenda himself.  More pointedly, Oliver's statement that Facenda's initial loss of care was a "disgrace" was clearly a statement of opinion.  And for the reasons noted above, Oliver's statement that Morley said "it's okay for people to have shit on them for days" was a substantially accurate report of his testimony.

In sum, none of the discrete statements identified by Morley is defamatory, even in context of the segment or broadcast as a whole.

## II.  Morley Has Not Stated a Claim for Defamation by Implication

Morley maintains that his claim is one solely for defamation, not defamation by implication.  Having concluded, however, that none of Defendants' individual statements were defamatory, even when properly viewed in context, the Court also considers whether Morley has plausibly alleged, in the alternative, a claim for defamation by implication.  Such a claim requires a showing that a combination of statements, though individually non-defamatory, nevertheless gave rise to a defamatory meaning.  *See Stepanov*, 120 A.D.3d at 35.  As noted above, Morley

urges that the Court find he has plausibly alleged the segment was defamatory when considering the "juxtaposition" of his statements with Oliver's statements and the other video clips. Pl.'s Opp'n at 13–15. Relying in part on the public reaction to the Episode in the YouTube comments section, Compl. ¶ 5; Pl.'s Opp'n at 6, he argues that the full segment "strung together" a mosaic of "successive statement[s]," which, even if individually were not defamatory, painted a "false portrayal" of and defamed him. Pl.'s Opp'n at 14–15. Defendants respond that the "interplay of the Episode's audio and visual elements" does not make the statement defamatory, even when "viewed in context." Dkt. No. 31 (Defs.' Repl. Br.) at 2. The Court agrees with Defendants that an ordinary or average viewer would not draw a defamatory implication from the segment, or the Episode as a whole, and thus holds that Morley has not stated a claim for defamation by implication.

### A. The Law of Defamation by Implication

Because the Court has determined that Morley does not plausibly allege any discrete defamatory statements—even when those statements are viewed in context—his claim can only survive as one for defamation by implication. When a defamation claim is based on a series of "factual statements" that are "substantially true," a plaintiff may only recover a defamation claim by meeting the more rigorous requirements of a defamation by implication claim. *Stepanov*, 120 A.D. at 37; *see also Kavanagh v. Zwilling*, 578 F. App'x. 24, 24–25 (2d Cir. 2014) (recognizing *Stepanov* as setting forth the law applicable to defamation by implication claims).

In *Herbert v. Lando*, the Second Circuit described a claim for defamation by implication as one where a "combination of individual statements which in themselves may not be defamatory might lead the reader to draw an inference that is damaging to the plaintiff." 781 F.2d 298, 307 (2d Cir. 1986). In a footnote, the *Herbert* court provided the following hypothetical:

20

> If, for example, a newspaper account of a rash of neighborhood thefts also reported that a public figure had recently moved into the neighborhood, purchased tools commonly used in burglaries, and had been seen at a number of homes where burglaries had occurred, a reader would be led to believe that the individual described had committed the crimes. Such a deductive inference might well be actionable if there is proof the article was published with actual malice.

*Id.* at 307 n.4; *see also Elias v. Rolling Stone LLC*, 872 F.3d 97, 109 (2d Cir. 2017).

"To survive a motion to dismiss a claim for defamation by implication where the factual statements at issue are substantially true" or otherwise not defamatory, "a plaintiff must make a rigorous showing that the language of the communication as a whole can reasonably be read both to impart a defamatory inference and to affirmatively suggest that the author intended or endorsed that inference." *Stepanov*, 120 A.D.3d at 34. "Substantial truth" turns on the understanding of the "average" viewer, *Meloff v. N.Y. Life Ins. Co.*, 240 F.3d 138, 146 (2d Cir. 2001), and an implication is substantially true if it would not "have a different effect on the mind of the [viewer] from that which the pleaded truth would have produced." *Jewell v. NYP Holdings, Inc.*, 23 F. Supp. 2d 348, 366 (S.D.N.Y. 1998).

"[A] defamation by implication claim must still meet the other requirements of a defamation claim," meaning that the usual defenses to defamation remain available to Defendants. *1st Amend. Praetorian*, 2025 WL 949575, at *5; *see also Biro*, 883 F. Supp. 2d at 470 (holding that implications may not be actionable if they are expressions of opinion). In the context of a television program, "the [defamatory] words must be construed in the context of the entire program, tested against the understanding of the average viewer, and if not reasonably susceptible of a defamatory meaning, they are not actionable and cannot be made so by a strained or artificial construction." *Lasky*, 631 F. Supp. at 968.

B.  **The Segment's Implication is Not Defamatory**

The Court now considers whether the segment defamed Morley by implication.  Morley alleges that Oliver intended to convey, and did convey, two defamatory inferences: First, that Morley "illegally denied care to [(a)] Louis [Facenda] and/or [(b)] the alleged 'similar' Actual Patient [McDonald]," and second, that he "testified that it is 'okay' for individuals who wear diapers and/or cannot bathe themselves 'to have shit on them for days' and to otherwise be left sitting in their own bowel movements for days."  Compl. ¶ 100.  For all the reasons stated above in the discussion of express or direct defamation, and for those that follow, Morley has not plausibly alleged that the broadcast was defamatory by implication.

First, Oliver did not impart the defamatory inference that Morley illegally denied care to Facenda, because Oliver clearly stated that Morley's testimony regarded a "similar patient," which necessarily conveys it was not in fact Facenda.  Morley argues that the sequencing of the segment—beginning with the 900% illegal denial statistic and continuing to the discussion of Facenda's case, followed by Morley's statement—implies to viewers that Morley was responsible for the denial of care to Facenda.  The Court disagrees.  Oliver used both the Facenda clips and Morley's testimony in the McDonald hearing as examples of what Oliver described as the callous "prioritizat[ion of] cost cutting over patients."  Compl. ¶ 48(c).  He finished the segment by saying that "AmeriHealth eventually restored Louis [Facenda's] service," with AmeriHealth's corporate logo displayed on-screen, Episode at 32:40, but never once suggested that Morley personally—as opposed to the MCO—was responsible for Facenda's initial loss of care.  The "solution" Oliver suggested to the problems he identified in Iowa was not, for instance, for Morley to be terminated, but for the United States to "adopt a universal healthcare model" and for Medicaid to be run with "significantly more care and efficiency."  *Id.*  In other words, both Facenda's initial loss of care

and Morley's testimony in the McDonald hearing were two examples of some of the problems Oliver identified in the administration of Medicaid by private MCOs.

Nor would a reasonable viewer be led to infer that Morley "illegally denied care to . . . the alleged 'similar' Actual Patient [McDonald]." Compl. ¶ 100. There is no question that Morley supported the limitation of McDonald's care, even if he did not support a full denial of such care. But the Court rejects Morley's argument that Oliver improperly implied that McDonald's partial denial of care was "illegal." Within the context of the Episode, the Facenda and McDonald examples were of "cost cutting," not the "illegal" denials discussed in the State Auditor's Report. Indeed, Oliver never once suggested that McDonald's partial denial of care was one of the illegal denials covered in the Auditor's Report, and the Episode cannot be reasonably understood to make that implication.[5]

The Court also rejects the second inference urged by Morley: that Oliver falsely suggested that Morley testified it is okay for people in diapers to sit in feces for days. Oliver did tell viewers that Morley "thinks it's okay if people have shit on them for days." Compl. ¶ 48(h) (emphasis omitted). And in sometimes angry and profane language, he added that Morley's testimony "made me want to punch a hole in the wall," exclaiming "fuck that doctor with a rusty canoe." Compl. ¶¶ 1, 48(h)–(i). But none of these statements, nor Oliver's others, specifically concerned diapers or diaper-changing. Oliver was making a clear and simple point: that it was "enraging" for Morley to testify that it was acceptable for a cerebral palsy patient who had trouble fully cleaning himself to go without daily cleaning of fecal matter—or in Oliver's words, that a patient should be allowed

---

[5] Defendants further argue that even if viewers were left with the impression the partial denial of care to McDonald was illegal, it would still not be defamatory because AmeriHealth eventually backtracked and reauthorized the full allotment of nursing visits McDonald sought. Defs.' Br. at 18 (arguing that "AmeriHealth itself apparently concluded that Morley's denial of services was improper," and the Episode was therefore "substantially accurate" because "reviewing the court records would not have produced a materially different effect on the viewer than watching the Episode") (citing *Friedman*, 884 F.3d at 93).

"to have shit on them for days." Neither Oliver's summary of Morley's testimony nor his editorial reaction was premised on the notion that Morley had expressed a view about patients who necessarily wear diapers. Oliver's footage of Facenda illustrated the human cost of the policies he was criticizing; it did not suggest that Morley's testimony in a similar case concerned a patient who specifically required diaper-changing.

As Morley rightly notes, certain viewers made YouTube comments indicating their belief that Morley's testimony concerned a man who wears diapers. But the fact "that some readers may infer a defamatory meaning from a statement does not necessarily render the inference reasonable under the circumstances." *Jacobus v. Trump*, 51 N.Y.S.3d 330, 336 (Sup. Ct. N.Y. Cnty. 2017), *aff'd,* 156 A.D.3d 452 (1st Dep't 2017). In *New York Times Co. v. Sullivan*, for example, the Supreme Court disregarded the conclusion of witnesses that certain statements were of and concerning a defamation plaintiff because the witnesses' conclusion rested on an "unsupported assumption." 376 U.S. 254, 289 (1964). Online comments, in particular, are not always representative of reasonable or ordinary understandings of speech. *See, e.g.*, *Graham v. UMG Recordings, Inc.*, 806 F. Supp. 3d 454, 474 (S.D.N.Y. 2025) ("YouTube commentors . . . do not alter the Court's analysis. In a world in which billions of people are active online, support for almost any proposition, no matter how . . . unreasonable, can be found with little effort in any number of comment sections.").

Even if a reasonable or ordinary viewer were to draw the implication that Morley testified that it is acceptable for people to sit in dirty diapers for days, however, that implication would not be defamatory. Morley did testify that he "would allow" an individual with cerebral palsy—whose nurse testified that he could not "wipe himself and become clean" and whom the ALJ described as having "difficult[y] . . . grasping objects," "hav[ing] poor personal hygiene," and being "unable

24

adequately to [sic] complete perineum cares"—to have fecal matter on him for more than one day. McDonald Hr'g at 1:38:34–54; Proposed ALJ Decision at 5, 7.[6]  In the Court's view, that would have no materially worse effect on the average viewer than the implication Morley alleges Oliver wrongfully made: that Morley thought it was alright for an individual with cerebral palsy to sit in a dirty diaper for more than one day.  Under the fair report privilege, "[a] report is substantially accurate"—and thus privileged—"if, despite minor inaccuracies, it does not produce a different effect . . . than would a report containing the precise truth." *Lang Sang v. Ming* Hai, 951 F. Supp. 2d 504, 520 (S.D.N.Y. 2013).  And under the substantial truth defense, when a statement has a minimally different effect than the absolute truth on viewers, that difference does not render a statement defamatory. *See, e.g.*, *Guccione v. Hustler Magazine, Inc.*, 800 F.2d 298, 302 (2d Cir. 1986) (holding that "calling [plaintiff] an 'adulterer' . . . was substantially true" even though "'former long-time adulterer' would have been more precise.  But on the facts of this case, to require such a level of accuracy is unreasonable."); *Egiazaryan v. Zalmayev*, 880 F. Supp. 2d 494, 504 (S.D.N.Y. 2012) (statement that plaintiff was member of Russian parliament, rather than mere candidate for parliament, did not have different effect on the reader sufficient to support a defamation claim); *see also 1st Amend. Praetorian*, 2025 WL 949575, at *5 (traditional defamation defenses applicable to defamation-by-implication claim).  The Court refuses to accept the notion that an ordinary viewer would view two patients—both of whom have cerebral palsy and trouble wiping themselves and keeping themselves fully clean of fecal matter, but only one of whom actually wore a diaper—as anything but "similar."

---

[6] Given Morley's reliance on the ALJ's "court adjudicated" findings,  Pl.'s Opp'n at 8–9, the Court does the same in assessing both the fair report privilege and substantial truth.

In sum, the implication of the segment, like the specific statements within it, was not defamatory. Morley, therefore, has not stated a claim for defamation, even by implication.

### III. Defendants' Anti-SLAPP Motion Fails

In addition to dismissal of this action, Defendants seek attorneys' fees under New York's anti-SLAPP law, New York Civil Rights Law § 70-a. Morley urges the Court not to apply § 70-a, arguing that the law is procedural in nature and conflicts with the Federal Rules of Civil Procedure, and therefore cannot be applied in federal court under the *Erie* doctrine. The Court, however, need not reach this question, on which courts in this District are divided, because Defendants have not sought fees via the proper procedural vehicle. Section 70-a provides that a person "may maintain an action, claim, cross claim or counterclaim to recover damages, including costs and attorney's fees, from any person who commenced or continued such action" which otherwise qualifies under the statute as an anti-SLAPP action. N.Y. Civ. Rights Law § 70-a(1). Defendants have not brought an "action, claim, cross claim, or counterclaim" for fees. *Id.* They have instead solely appended a motion for fees to their motion to dismiss. *See* Defs.' Br. at 28. That is insufficient under the statute. "On its face, . . . [§ 70-a] requires that an applicant for attorney's fees 'maintain an action, claim, cross claim or counterclaim,' and not simply assert a request as part of a motion to dismiss." *Chinese Ams. Civ. Rts. Coal., Inc. v. Trump*, 2022 WL 1443387, at *6 (S.D.N.Y. May 6, 2022) (quoting N.Y. Civ. Rights Law § 70-a(1)); *see also Lindell v. Mail Media Inc.*, 575 F. Supp. 3d 479, 489 (S.D.N.Y. 2021) (same). Defendants' motion for attorneys' fees, therefore, is denied.

### CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is granted. In the Episode, John Oliver makes a scathing critique of the U.S. healthcare system. He expresses outrage about the cancellation of medical and nursing services for Louis Facenda, a man with cerebral palsy who

26

could not clean himself after bowel movements and wore a diaper.  He exhibits anger as well about Dr. Morley's testimony in a case concerning Nathan McDonald, another cerebral palsy patient who similarly needed assistance to become fully clean—but did not wear a diaper.  In a hearing regarding the limitation of nursing care for McDonald, Morley testified that "people can be a little bit dirty sometimes" and that he "would allow [McDonald] to be a little dirty for a couple of days." Morley argues that Oliver defamed him by falsely suggesting this testimony applied to people with cerebral palsy who wear diapers (like Facenda), as opposed to merely those with cerebral palsy and who have trouble cleaning themselves of fecal matter but do not wear diapers (like McDonald). The Court declines Morley's invitation to parse Oliver's statements so rigidly and rejects the contention that a reasonable or ordinary viewer would draw the distinction between the two men that Morley suggests exists.  In this Court's view, the trauma and loss of human dignity that befalls a man with cerebral palsy who has trouble cleaning himself and is left for days in his own fecal matter is the same, regardless of whether or not he wears a diaper.  Oliver used Morley's testimony in the McDonald case to make his point about the substantially similar Facenda case.  Even looking beyond Oliver's discrete statements, the overall implication of the segment was not defamatory. Oliver accurately described Morley's testimony in the McDonald hearing, using it, like Facenda's story, as a demonstration of the segment's broader criticism of the harms of Medicaid privatization.

Accordingly, this action is dismissed, as is Defendants' motion for fees.  The Clerk of Court is respectfully directed to terminate the motion pending at Docket Number 21 and close this case. SO ORDERED.

Dated:    June 2, 2026
          New York, New York

Hon. Ronnie Abrams
United States District Judge

27